Merrill ROSENBERG, Trustee in Bank-
ruptcy of Boyle Sundries, Inc.

v.

Harold RUDNICK.

Civ. A. No. 64–738.

United States District Court
D. Massachusetts.

Jan. 18, 1967.

**636**

Joseph Braunstein, Cohn, Riemer & Pollack, John F. McCarty, Jr., Jerome Medalie, Boston, Mass., for plaintiff.

Charles F. Barrett, Boston, Mass. (appearing specially for deposition), for defendant.

## OPINION

FRANCIS J. W. FORD, D. J.

This is an action by a trustee in bankruptcy to set aside a transfer of property to a creditor of the bankrupt as preferential.

The bankrupt, Boyle Sundries, Inc., was a Massachusetts corporation doing business in Haverhill and engaged in the distribution of cosmetics and drug sundries. On April 30, 1962 defendant made a loan to the corporation in the amount of $110,000. By a security agreement executed in connection with the loan, Boyle gave to Rudnick " * * * a security interest in all the equipment, machinery, fixtures, inventory and accounts receivable of the debtor, together with all additions thereto and all property now or hereafter substituted therefor or otherwise acquired in the ordinary course of business." A financing statement recording the essentials of this security agreement was filed on May 2, 1962 with the Secretary of State of Massachusetts and the City Clerk of Haverhill.

Boyle opened an account with the National Shawmut Bank in which the $110,000 was deposited. Checks of the corporation drawn on this account had to be signed by both Howard Boyle, the president and treasurer of the corporation and by Rudnick. From April 30, 1962 to October 17, 1962 Irving Helman, Rudnick's attorney, served as a director of Boyle.

Boyle continued in business up to October 24, 1962. During this period it acquired in the normal course of business additional items of inventory. In June of 1962 Boyle borrowed $15,000 from the Shawmut Bank on a note which Rudnick endorsed. This note was not paid when due in 90 days, and Rudnick also endorsed a renewal note for an additional 90 days, dated September 4, 1962.

During July, August and September, 1962 Howard Boyle asked Rudnick for additional money for the business. Rudnick did guarantee payment to some suppliers who sold merchandise to Boyle. On two occasions Helman, at Rudnick's direction, sent accountants to examine Boyle's books. The July examination was confined to "aging" the accounts receivable, that is, preparing a schedule showing outstanding accounts receivable and how long they had been owing.

A second audit was made on behalf of Rudnick in October and a report, including a balance sheet, delivered to his attorney. On October 22 Rudnick demanded payment of the $110,000 note. When payment was not made he exercised his rights under the security agreement by taking possession on October 24 of the collateral on Boyle's premises, virtually all of which consisted of Boyle's inventory of sundries and cosmetics. Rudnick caused this inventory to be sold at public auction on November 20, 1962. The total sales price was $60,614.00, of

which $60,112.50 represented inventory. The net proceeds to Rudnick after deductions of commissions and expenses amounted to $55,764.39.

Rudnick paid $1000 to one Freije in settlement of a claim by Freije that some of the merchandise taken from the Boyle premises by Rudnick belonged to Freije. He also paid $700 to Lady Lora, Inc. on account of debts of Boyle which he had guaranteed, and paid $11,370.05 to the National Shawmut Bank, the amount remaining unpaid on Boyle's note of September 4, 1962 to the bank which Rudnick had endorsed.

There was testimony from a certified public accountant that he had prepared balance sheets of Boyle for various dates based on the figures in Boyle's general ledger which showed that the excess of the liabilities of the corporation over its assets amounted to $42,769.08 as of May 31, 1962, $39,412.61 as of June 30, 1962, $41,135.22 as of July 31, 1962 and $52,939.77 as of October 31, 1962. In making these computations the accountant accepted at full value as assets of the corporation loans in the amount of $28,000 shown on the books as due from Howard Boyle and his wife. Boyle testified that in fact they were unable during this whole period to meet these obligations, and Rudnick knew of this fact. Clearly the corporation was insolvent at least during the period of these computations.

■ On November 9, 1962 an involuntary petition in bankruptcy was filed in this court against Boyle and adjudication followed on December 12, 1962. Plaintiff was appointed as receiver and later as trustee in bankruptcy. About November 15, 1962 plaintiff and defendant entered into an agreement that plaintiff would not institute proceedings to enjoin the auction sale scheduled for November 20, and that defendant would deliver the proceeds of the sale to Helman to be held in escrow for 90 days and thereafter until the termination of any proceedings which might be instituted by plaintiff to recover the proceeds for the bankrupt estate. If no such proceeding had been instituted within 90 days, the escrow was to be discharged. No proceeding was instituted and the money was finally paid to defendant. Defendant argues that plaintiff is therefore barred by estoppel or laches from bringing the present action. There is nothing in the agreement which supports this contention. Plaintiff did not agree that he would bring his action within 90 days or not at all. If he chose not to act within 90 days he lost the security of having the proceeds held intact in escrow pending determination of the dispute, but there is nothing to indicate that he waived also his right to bring an action thereafter.

■ The trustee in order to prove a preferential transfer under § 60 must show that the debtor (1) made or suffered a transfer of his property, (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt, (4) while insolvent, and (5) within four months of bankruptcy or of the filing of the petition in bankruptcy, (6) the effect of which will be to enable the creditor to obtain a greater percentage of his debt than some other creditor of the same class; and in order to show that the preference is voidable must show that the transferee at the time of the transfer had reasonable cause to believe that the debtor was insolvent.

As to some of these elements there can be little question here. It is clear that there was a transfer by the debtor of substantially all of its property to Rudnick, a creditor, in payment of the debt arising out of the $110,000 loan made on April 30, 1962. It is also clear that during the period of four months preceding the filing of the petition in bankruptcy the debtor was at all times insolvent and that at all times during that period the defendant knew enough about the financial situation of the debtor to have reasonable cause to believe the debtor was insolvent.

The serious question here, however, is when the transfer of debtor's property to Rudnick should be deemed to have taken place. If, as Rudnick contends, the transfer took place with the execution of the security agreement on April 30, 1962 then it took place prior to the four month

period preceding bankruptcy, contemporaneously with the creation of the debt, and had the effect of giving Rudnick the status of a secured creditor rather than giving him an improper advantage over other general creditors.

Trustee's contention is that as to items of inventory acquired by the debtor after April 30, 1962 the security interest of Rudnick attached only when each item of inventory was acquired by the debtor. Consequently, as to so much of the inventory as debtor acquired during the four months preceding bankruptcy the transfer took place within the four month period on account of an antecedent debt and resulted in giving Rudnick a greater percentage of his debt than other general creditors.

■ The transfer in question here, of course, is not the physical transfer of possession which took place on October 24, 1962, but the parting by debtor of a security interest in the property. The time of transfer must be determined in accordance with § 60(a) (2) of the Bankruptcy Act which provides:

> "For the purposes of subdivisions (a) and (b) of this section, a transfer of property * * * shall be deemed to have been made or suffered at the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee."

However, the question of when the requisite perfection has been reached is one which must be determined by the applicable state law, in this case the law of Massachusetts. The governing statutory provisions are those of the Uniform Commercial Code, Mass., G.L. Ch. 106.

■ Trustee relies on § 9–303 which provides: "(1) A security interest is perfected when it has attached and when all the applicable steps required for perfection have been taken. * * * If such steps are taken before the security interest attaches, it is perfected at the time when it attaches." § 9–204(1) provides

that: "(1) A security interest cannot attach until * * * the debtor has rights in the collateral * * *" (It is stipulated here that by filing the security statements Rudnick took all the applicable steps required for perfection.) A first literal reading of these provisions would seem to support the trustee's contention. However, § 60(a) (2) does not make the test one of when the state law may denominate a security interest as perfected. The specific test of § 60(a) (2) is one of when under state law the security interest, however described, becomes one which cannot be defeated by a subsequent lien obtainable in proceedings on a simple contract action. Perfection under state law need not be full perfection but only perfection *so far* as is necessary to meet the test of § 60(a) (2). While the Massachusetts law may not regard a security interest in after-acquired inventory as fully perfected until it attaches to items as they are acquired by the debtor, nevertheless § 9–204(3) recognizes that a lien in such inventory items can be validly created by a security agreement. Such a lien, after proper compliance with the filing provisions, is superior to a subsequently acquired contract creditor's lien or other claims of third parties except the rights of buyers in the ordinary course of business under § 9–307(1) and holders of perfected purchase money security interests under § 9–312(3). In this case the security interest was created by the execution of the security agreement on April 30, 1962 and the subsequent compliance with the filing provisions. As of that date the security interest met with the requirements of § 60(a) (2) and the transfer must be regarded as having taken place on that date.

■ Another section of the Uniform Commercial Code, § 9–108, presents a different approach to the problem. It provides:

> "Where a secured party makes an advance, incurs an obligation, releases a perfected security interest, or otherwise gives new value which is to be secured in whole or in part by after-acquired property his security interest

in the after-acquired collateral shall be deemed to be taken for new value and not as security for an antecedent debt if the debtor acquires his rights in such collateral either in the ordinary course of his business or under a contract of purchase made pursuant to the security agreement within a reasonable time after new value is given."

This section would produce the same result in the present case. Assuming that, as trustee contends, no transfer would take place until each specific item of inventory was acquired by the debtor, under § 9-108 it would be deemed to have been made for new value rather than as security for an antecedent debt and hence would not be a preferential transfer. The validity of this provision has been questioned. Under the Bankruptcy Act the definition of what constitutes an antecedent debt is not one to be determined by state law. The Bankruptcy Act itself does not define antecedent debt. In view of the fact that the Uniform Commercial Code has now been adopted by 48 states, it would seem that the definition of § 9-108 should be regarded as generally accepted and in accord with current business practice and understanding and hence applied in bankruptcy. In any event, even if the definition adopted by § 9-108 is not accepted, the section clearly shows that the intent of the Uniform Commercial Code is that a transfer such as the one involved here should not be considered a preferential one, and the Code's provisions as to perfection and attachment of security interests should not be interpreted to produce a different result.

■ Plaintiff's contentions are based on the view that the liens under the security agreement should be considered as attaching separately to each distinct item included in the inventory. In applying § 60, however, inventory subjected to a security interest should be viewed as a single entity and not as a mere conglomeration of individual items each subject to a separate lien. "In other words, the *res* which is the subject of the lien * * is the merchandise or stock in trade,

conceived of as a unit presently and continuously in existence—a 'floating mass', the component elements of which may be constantly changing without affecting the identity of the *res*." Manchester National Bank v. Roche, 1 Cir., 186 F.2d 827, 831. The security interest is in the entity as a whole, not in its individual components, and the transfer of property occurs when this interest in the inventory as an entity is created. Matthews v. James Talcott, Inc., 7 Cir., 345 F.2d 374, 380.

The transaction here was not one of those which the provisions of § 60 were designed to avoid. There was nothing here in the nature of a secret lien. There was no attempt by one creditor to outrace others at the last moment before bankruptcy. Defendant here bargained for and acquired his security interest at the time he made his loan. The statutory provisions for notice filing were fully complied with. No supplier who sold merchandise on credit to Boyle can justifiably claim he relied on the appearance of Boyle's inventory. He could easily have determined the extent of Rudnick's interest in it, and could have protected himself, if he so wished, either by perfecting a purchase money security interest under § 9-312(3), or, as some suppliers did, by getting Rudnick to guarantee payment.

The conclusion must be that in the transaction involved here the transfer from Boyle to Rudnick took place on April 30, 1962, contemporaneously with the creation of the debt secured and more than four months before the filing of the bankruptcy petition, and therefore there was no preference within the meaning of § 60 of the Bankruptcy Act.

Furthermore, assuming that there was a preference, plaintiff has not been able to show with any reasonable certainty what the amount of the preference is. Concededly, insofar as the inventory taken over by defendant on October 24, 1962 consisted of items included in the inventory on April 30, 1962 or acquired by Boyle thereafter, but more than four months before the filing of the petition,

there was no preference. On trustee's own theory there was a preferential transfer only as to items of inventory acquired by Boyle during the four month period. There was no evidence to show when any item in the October 24 inventory was acquired. Plaintiff argues that here the court should consider the inventory as a whole rather than individual items, and that if it can be shown that there was an increase in the total value of the inventory between certain dates within the four month period this increase in value should be attributed to goods acquired during that period, and that a preference to the extent of the increased value of the inventory has been shown.

Plaintiff tries to show such an increase by the testimony of an accountant who endeavored to reconstruct from the information in Boyle's books the value of inventory at the end of each month during the relevant period. The accountant arrived at the value of the inventory on hand at the end of any given month by taking the inventory figure given in the books as of January 1, 1962 (purportedly representing an actual physical inventory made by Boyle), adding to it the total of all merchandise purchases shown on the books through the end of the given month, and subtracting from this total the assumed cost of the goods removed from inventory during the period. For the cost of the goods removed from inventory a figure equal to 80% of sales during the given period was used, based on the assumption that Boyle's average mark up on sales was 20%, a figure approximating the mark up shown on the books for the previous year.

 The results of these computations cannot be accepted as an accurate picture of the real inventory. They involve several unproved assumptions. It is assumed that the books of the bankrupt are accurate and complete. It is assumed that the ledger entries in purchase accounts reflect the date on which the merchandise was actually received. More important, it is assumed that Boyle continued to sell all merchandise at a 20%

mark up right up to the end. There was evidence indicating that during the last months of its business life Boyle was selling goods at cost or even below cost. Consequently these computations would not furnish an adequate basis for determining with any reasonable accuracy the amount of the preference which would exist if plaintiff's contentions were correct.

Judgment will be entered for defendant.