In the Matter of **PORTLAND NEWS-PAPER PUBLISHING CO., Inc.,**
**Bankrupt.**

**No. B 64-3282.**

United States District Court
D. Oregon.

Aug. 22, 1967.

Don S. Willner, Willner, Bennett & Leonard, Portland, Or., for petitioners Rose City Development Co., Inc., and Anthony DuBay.

Gilbert Sussman, Sussman, Shank & Wapnick, Portland, Or., for petitioner, Robert J. Davis.

Edward A. Boyrie, Boyrie, Miller & Long, Portland, Or., for trustee in bankruptcy.

James C. Dezendorf, Rupert R. Bullivant, Portland, Or., Joseph McKeown, Coos Bay, Or., Robert Haydock, Jr., Boston, Mass., for the Permanent Editorial Bd. for the Uniform Commercial Code, amicus curiae.

## OPINION

SOLOMON, Chief Judge:

Rose City Development Company, Inc., R. Anthony DuBay and Robert J. Davis petitioned to review and reverse the order of the Referee in Bankruptcy disallowing their claims against the bankrupt, Portland Newspaper Publishing Co., Inc., as preferences under Section 60 of the Bankruptcy Act, 11 U.S.C.A. § 96.

Each of the petitioners contends that he has a valid security interest in the bankrupt's accounts receivable. Their claims are based on separate agreements which provide for security interests in present and future accounts receivable. The accounts were collected by Leland Arnett, the representative for the three petitioners, and were deposited in accounts under the joint control of Arnett and the trustee in bankruptcy.

In the winter of 1959, various unions struck and picketed the Oregonian and the Oregon Journal, Portland's daily newspapers. In 1960, the striking unions organized the Portland Reporter Publishing Company, Inc., to publish The Reporter, a daily newspaper, to compete with the existing ones. The unions also incorporated Rose City Development

Company (Rose City) to acquire buildings to house The Reporter.

In March, 1964, The Reporter, for lack of funds, suspended publication for one day. Later that month, petitioner Davis suggested a plan to provide additional capital. Under his plan the Portland Reporter Publishing Company was merged into the Portland Newspaper Publishing Company; Davis agreed to purchase $225,000 of the stock in the merged corporation, but only if the board of directors in its discretion decided that the new corporation needed the money. Davis was to be relieved of his obligation if the board of directors believed that further publication held no reasonable expectation of profit and was an unsound business venture due to unforeseen extraordinary circumstances.

From April, 1964, to September, 1964, Davis purchased $156,000 of stock. On September 27, 1964, the board found that further publication was an unsound business venture due to unforeseen extraordinary circumstances and relieved Davis from his obligation to purchase $69,000 of stock, the balance of his commitment. The board also announced that the paper would stop publication on September 30, 1964.

On September 28, 1964, Rose City, DuBay and Davis appointed Arnett as their representative to collect the accounts receivable which they claimed were subject to their security interests.

On October 15, 1964, wage claimants of the Portland Newspaper Publishing Company, Inc., filed an involuntary petition of bankruptcy. Four days later the corporation was adjudicated a bankrupt.

Arnett and the trustee in bankruptcy are now holding $107,000 in the joint bank account.

The Referee held that the Portland Newspaper Publishing Company, Inc., hereinafter called "The Reporter," was insolvent during the four months preceding bankruptcy and that the petitioners knew or should have known it was insolvent. The Referee also held that the

petitioners' claims were invalid preferences under Section 60 of the Bankruptcy Act.

## INSOLVENCY AND KNOWLEDGE OF INSOLVENCY

Rose City and DuBay, but not Davis, contend that the Referee erred in holding that The Reporter was insolvent and that they knew or should have known that it was insolvent during the four months prior to October 15, 1964.

The balance sheets of The Reporter, prepared by its auditor and controller, show that at the end of May, 1964, The Reporter's capital deficit amounted to $14,963. At the end of June, 1964, it was $19,968 and thereafter the capital deficit increased each month. By September 30, 1964, it was $63,116.

Rose City and DuBay contend that the following items should have been included as assets on the balance sheets:

(1) the difference between the fair rental value of the building The Reporter leased from Rose City and the amount The Reporter paid Rose City under the lease;

(2) the difference between the fair rental value of the printing equipment The Reporter leased from two unions and the amount The Reporter paid under the leases;

(3) the value of the free labor The Reporter received from unions; and

(4) the sum of $69,000, the amount the board of directors relieved Davis from paying under the March, 1964, agreement to purchase stock.

Section 1(19) of the Act, 11 U.S.C.A. § 1(19) defines insolvency as follows:

"A person shall be deemed insolvent within the provisions of this title whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not at a fair valuation be sufficient in amount to pay his debts."

■ "Property" as used in the Act denotes "something subject to ownership, transfer, or exclusive possession and enjoyment, which may be brought within the dominion and control of a court through some recognized process." Gleason v. Thaw, 236 U.S. 558, 561, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915).

■ The Referee correctly held that none of these items are "property" within the meaning of the Act and that they were properly excluded from the balance sheets. None were listed as assets prior to bankruptcy because The Reporter's interest in them was limited and contingent in nature. Neither the lease for the building nor for the printing equipment was assignable without the consent of the lessors. The Reporter's use of the building and the printing equipment was limited to publishing a newspaper and the leases were to be terminated if The Reporter became insolvent.

The unions were not obligated to supply free labor to The Reporter and at their option could stop it. Davis was obligated to purchase additional stock if the board of directors believed that The Reporter needed additional money and only if the board believed that there was still a reasonable expectation that a profit could be made from the paper's operation.

None of the items were of any value to The Reporter or to The Reporter's creditors if The Reporter ceased publication. None of them could be sold or leased by The Reporter prior to bankruptcy to pay its debts. In spite of the favorable leases, the free labor, and Davis' $156,000 capital contribution, The Reporter's operating losses and capital deficit continued to increase. The Reporter's board was justified in finding that there was no reasonable expectation that a profit could be made from further publication of the paper.

■ The evidence supports the Referee's finding that The Reporter was insolvent during the four months preceding bankruptcy.

Rose City was The Reporter's landlord. Asa Williams, president of Rose City, frequently visited The Reporter's plant to discuss the financial condition of the paper. Davis told him that The Reporter could not afford to pay the delinquent rent. Williams admitted that he never believed that The Reporter was solvent.

DuBay was a director of the Portland Reporter Publishing Company, Inc., from December 1, 1961, to May 1, 1964, the date of the merger. He knew that at the time of the merger the corporation's operating losses were $1,118,228. After the merger, DuBay asked Davis about the possibility of having his secured claim paid, and Davis told him that The Reporter could not pay old claims.

The same lawyers who represented Rose City and DuBay also represented The Reporter. One of the attorneys attended every board meeting and knew The Reporter's financial difficulties. The law firm billed The Reporter $10,480 for legal services but could collect only $4,667.74.

■ The evidence supports the Referee's finding that Rose City and DuBay had reason to believe that The Reporter was insolvent during the four months preceding bankruptcy.

### ROSE CITY'S CLAIM

■ Rose City loaned $45,000 to The Reporter on November 16, 1963, and $10,300 on November 22, 1963. To secure the loans the parties entered into a security agreement dated November 22, 1963, by which The Reporter assigned to Rose City a security interest in all of its accounts receivable "now existing or hereafter arising." On November 26, 1963, a financing statement recording the essentials of the agreement was filed. When The Reporter was adjudicated a bankrupt, it owed Rose City $42,822.26 on the $45,000 note and the full amount on the $10,300 note.

The Referee held that Rose City's security interest in the accounts receivable which did not come into existence until four months prior to bankruptcy was a voidable preference under Section 60.

Judge Ford in Rosenberg v. Rudnick, 262 F.Supp. 635, 637 (D.Mass.1967), set forth the requirements of a preferential transfer under Section 60. He stated that the trustee must show that the debtor:

" \* \* \* (1) made or suffered a transfer of his property, (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt, (4) while insolvent, and (5) within four months of bankruptcy or of the filing of the petition in bankruptcy, (6) the effect of which will be to enable the creditor to obtain a greater percentage of his debt than some other creditor of the same class; and in order to show that the preference is voidable must show that the transferee at the time of the transfer had reasonable cause to believe that the debtor was insolvent."

Section 60(a) (2) reads:

" \* \* \* a transfer of property other than real property shall be deemed to have been made or suffered at the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee."

There are two questions here. First, was Rose City's security interest in the accounts transferred within four months of the bankruptcy? Second, was the transfer of the security interest in the accounts which came into existence during the four month period for an antecedent debt?

Section 60(a) (2) looks to state law to determine when the transfer is deemed to have been made. Rose City contends that there was only one transfer because all of the accounts should be considered as a unit or a floating mass and that the transfer of both existing and future accounts occurred when the security agreement was executed and the financing statement filed.

ORS 79.2040 (UCC § 9–204) provides:

"(1) A security interest cannot attach until there is agreement \* \* \* that it attach and value is given and the debtor has rights in the collateral. It attaches as soon as all of the events in the preceding sentence have taken place unless explicit agreement postpones the time of attaching.

"(2) (d) For the purposes of this section the debtor has no rights in an account until it comes into existence."

ORS 79.3030(1) [UCC § 9–303(1)] provides:

"A security interest is perfected when it has attached and when all the applicable steps required for perfection have been taken."

The trustee claims that under UCC § 9–204 and § 9–303(1) a transfer of a future account is perfected only when the account comes into existence. Since Rose City's security interest in accounts which came into being within the critical four month period was not perfected until that time they are preferential transfers under Section 60.

The trustee's contentions were noted and rejected in Rosenberg v. Rudnick, supra. In that case the creditor in April, 1962, received a security interest in the debtor's "equipment, machinery, fixtures, inventory and accounts receivable \* \* \* together with all additions thereto and all property now or hereafter substituted therefor or otherwise acquired in the ordinary course of business." When the debtor failed to pay the debt in October, 1962, the creditor under the security agreement took possession of the debtor's inventory and sold it. The debtor was adjudicated a bankrupt in December, 1962. The trustee relying on UCC §§ 9–303 and 9–204 contended that the transfer of the security interest in the inventory acquired by the debtor during the four months preceding bankruptcy was a voidable preference under Section 60.

Judge Ford was of the opinion that inventory subject to an after-acquired

security interest should be viewed as a single entity and not as individual items each subject to a separate lien. He stated:

"In applying § 60, however, inventory subjected to a security interest should be viewed as a single entity and not as a mere conglomeration of individual items each subject to a separate lien. 'In other words, the res which is the subject of the lien * * * is the merchandise of stock in trade, conceived of as a unit presently and continuously in existence—a 'floating mass', the component elements of which may be constantly changing without affecting the identity of the res.' Manchester National Bank v. Roche, 1 Cir., 186 F.2d 827, 831. The security interest is in the entity as a whole, not in its individual components, and the transfer of property occurs when this interest in the inventory as an entity is created. Matthews v. James Talcott, Inc., 7 Cir., 345 F.2d 374, 380." 262 F.Supp. at 639.

He held that under Section 60 the transfer was made when the security agreement was executed and not when each item of inventory was acquired by the debtor. Even if the liens under the security agreement were considered as attaching separately to each item of inventory, Judge Ford was of the opinion that the secured creditor's lien under the Code was superior to a subsequently acquired contract creditor's lien.

Judge Ford recognized that the definition of "antecedent debt" under the Bankruptcy Act is determined by federal law, but he stated:

"In view of the fact that the Uniform Commercial Code has now been adopted by 48 states, it would seem that the definition of § 9–108 should be regarded as generally accepted and in accord with current business practice and understanding and hence applied in bankruptcy." 262 F.Supp. at 639.

I agree with Judge Ford's decision.

The business community has depended upon a revolving or flow type of accounts receivable financing for many years. The trustee and Referee both concede that Rose City would have had a valid security interest if The Reporter had deposited the collected accounts in a separate bank account for the benefit of Rose City and then received a new loan, daily if necessary, equal to the amount of the deposit. The Code allows a financial institution or other creditor to make a loan secured by present and future accounts and permits the debtor to use the full amount of the loan without routing the proceeds of the old accounts through a cash collateral account. The old method was both expensive and cumbersome and necessarily increased the cost of money. I can find nothing either illegal or unethical in the arrangement sanctioned by the Code.

Good business practice should be good business law. The Uniform Commercial Code was sponsored by many of the leading businessmen in the country and it was drafted by outstanding legal scholars. Forty-nine states (every state except Louisiana), the District of Columbia and the Virgin Islands have adopted the Code to establish uniform laws governing commercial transactions.[1]

1. United States v. Wegematic Corporation, 2 Cir. 1966, 360 F.2d 674, 676, deals with Article 2 of the Code but the following excellent statement by Judge Friendly is applicable here:

"We find persuasive the defendant's suggestion of looking to the Uniform Commercial Code as a source for the 'federal' law of sales. The Code has been adopted by Congress for the District of Columbia * * * has been enacted in over forty states, and is thus well on its way to becoming a truly national law of commerce, which, as Judge L. Hand said of the Negotiable Instruments Law, is 'more complete and more certain, than any other which can conceivably be drawn from those sources of 'general law' to which we were accustomed to resort in the day of Swift

Without a clear-cut conflict, UCC § 9–108 should not be held to contravene Section 60. I find no such conflict. Section 60 seeks to prevent a creditor, shortly before bankruptcy, from improving his position over other creditors of the same class. ORS 79.1080 (UCC § 9–108) does not permit the evil which Section 60 seeks to prevent. Under the Code a creditor must comply with the notice filing provisions to perfect his security interest in future accounts, and knowledge of his lien on these accounts is therefore available to the business community. Under ORS 79.1080 the bankrupt's estate will not be diminished because the creditor is only receiving a substitution of security. There is no preference when new accounts are substituted for released old ones. See: In Re Pusey, Maynes, Breish Co. (Herr v. Philadelphia Nat. Bank), 3 Cir. 1941, 122 F.2d 606. Under ORS 79.1080 future accounts are deemed to have been taken for new value only if the debtor acquired his rights in the collateral in the ordinary course of his business.

From June 15, 1964, to September 28, 1964, accounts totaling $397,860.24 were collected by The Reporter, and these were replaced by new accounts totaling $395,085.87. These figures show that Rose City shortly before The Reporter's bankruptcy did not try to improve its position or grab assets which belonged to all creditors in the same class.

I find that Rose City did not receive a preferential transfer and that it has a valid security interest in all the accounts receivable of The Reporter whether they came into existence before or within four months of the bankruptcy.

The Referee's order disallowing Rose City's claim is reversed.

### ANTHONY DuBAY'S CLAIM

In June, 1962, DuBay executed a collateral agreement with The First National Bank of Oregon to secure the payment of a $25,000 loan which the bank made to the original corporation. In July, 1962, more than a year before the Uniform Commercial Code became effective in Oregon, this corporation to secure DuBay against a loss under the collateral agreement executed a security agreement and assigned 62 advertising accounts to DuBay. The pertinent provisions of the agreement are:

"WHEREAS, Assignor desires to assign to Assignee accounts receivable which are unpaid but which are due and owing or which will become due for advertising services rendered by Assignor * * *.

"1. The Assignee will from time to time, during the continuance of this agreement, select such accounts receivable as shall total not more than $40,000 at any one time * * *.

"2. Concurrently with such selection the Assignor will, by proper instrument in writing, a form of which is attached hereto, unconditionally assign, transfer and set over to the Assignee, his successors and assigns, all of Assignor's rights, title and interest in said accounts. * * *

"5. If any such account cannot be collected within a reasonable time and after reasonable efforts, Assignor will accept a reassignment of said account and Assignee may thereupon select another account to be assigned."

Attached to the agreement was an executed assignment of 62 advertising accounts. After the Code became effective in Oregon, DuBay promptly filed a financing statement.

When old accounts assigned to DuBay were paid or were no longer sufficient to secure him, Plotner, the controller for The Reporter and its predecessor, prepared lists of new accounts to be assigned to DuBay; he placed DuBay's

v. Tyson [16 Pet. 1, 10 L.Ed. 865]' * * * When the states have gone so far in achieving the desirable goal of a uniform law governing commercial transactions, it would be a distinct dis-

service to insist on a different one for the segment of commerce, important but still small in relation to the total, consisting of transactions with the United States."

initials on the Corporation's books next to each such account. These lists were on memoranda from Plotner to DuBay, his attorney and the corporation's board. The memoranda were dated August 31, 1962, April 30, 1963, November 30, 1963, February 24, 1964, and April 21, 1964. The lists did not follow the form of the executed assignment attached to the July, 1962, agreement. They neither contained words of assignment nor the signature of an officer of the corporation. The lists did not refer to future accounts.

DuBay contends that both the existing and future accounts of debtors named in the last list were assigned to him. He relies on the portion of the "WHEREAS" clause in the July, 1962, agreement which recites that the corporation "desires to assign to Assignee accounts receivable which are unpaid but which are due and owing or which will become due for advertising services rendered by Assignor."

The recital in the "WHEREAS" clause is both inconsistent and unclear, but even if standing alone it is entitled to the construction given it by DuBay, the entire agreement negates this construction. The agreement provided that DuBay "from time to time" would "select" accounts totaling $40,000. If DuBay was unable to collect an account which had been assigned to him, he was to reassign the account to the corporation and select another account. The agreement also provided that when DuBay selected an account, it was to be assigned by "a proper instrument in writing," a form of which was attached to the agreement. All of these provisions are inconsistent with the transfer of accounts not yet in existence.

I therefore find that the security agreement executed in July, 1962, did not give DuBay a lien on future accounts.

■ DuBay permitted himself to become unsecured. The amounts owed on the accounts named in the July, 1962,

assignment were collected and used in the publication of The Reporter. The memoranda prepared by Plotner did not validly assign any accounts to DuBay because they did not follow the form required by the July, 1962, agreement. They did not even contain words of assignment or the signature of the debtor. DuBay failed to reassign replaced accounts as required by the July, 1962, agreement. Even if the April 21, 1964, list assigned the sums then owed on the accounts listed, this would give DuBay little comfort because The Reporter collected and spent practically all of these accounts.

The Referee's order disallowing DuBay's claim is affirmed.

### ROBERT DAVIS' CLAIM

■ On December 13, 1963, Davis executed a collateral agreement in favor of The First National Bank of Oregon to secure a $25,000 loan made by the bank to The Reporter. On the same day The Reporter, to secure Davis against loss under the collateral agreement, executed a security agreement.[2] Attached to the agreement was a duly executed assignment of specific advertising accounts and $7,837.51 in circulation accounts. In accordance with ORS 79.4020 and UCC § 9–402, Davis promptly filed a financing statement.

Although Davis' security agreement was executed after the Uniform Commercial Code became effective in Oregon, the agreement was identical to DuBay's 1962 pre-code security agreement. The proper form of assignment was only used when the Davis agreement was executed. On February 24, 1964, and April 21, 1964, Plotner prepared lists of new accounts to be assigned to Davis. These lists are identical in form to the lists Plotner prepared for DuBay.

Davis, like DuBay, contends that both the existing and future accounts of debtors named in the last list were assigned to him. He also contends that

---

**2.** Mr. Gilbert Sussman, who appeared in this case for Robert Davis, was not his attorney when the security agreement was executed.

he is entitled to circulation accounts totaling $18,752.58, the amount of the circulation accounts listed on the April 21, 1964, memorandum. Unfortunately, the agreement failed to take advantage of the Code, which permits a security interest in after acquired property.

Davis' claim, like DuBay's must be disallowed and for the same reasons.

The Referee's order on Rose City's claim is reversed. In all other respects, his order is affirmed.

I am grateful to all counsel for their carefully prepared briefs and oral arguments. I am particularly grateful to Mr. Robert Haydock, Jr., of Boston, Massachusetts, who, on behalf of the Permanent Editorial Board for the Uniform Commercial Code, submitted an excellent brief and presented an outstanding oral argument on the validity of the Uniform Commercial Code provisions which permit security interests in after acquired property. All of them were of great help to me.