In the Matter of **KING–PORTER COMPANY, Inc., Bankrupt.**
**MILLS MORRIS COMPANY OF MISSISSIPPI, INC., doing business as Appliance Distributors of Mississippi, Appellant,**

v.

**Pat H. SCANLON, Trustee in Bankruptcy, Appellee.**

No. 30976.

United States Court of Appeals, Fifth Circuit.

July 19, 1971.

A. Spencer Gilbert, III, Jackson, Miss., for appellant; Wise, Carter & Child, Jackson, Miss., of counsel.

Robert G. Nichols, Jr., Pat H. Scanlon, Jackson, Miss., for appellee.

Before O'SULLIVAN *, THORNBERRY and DYER, Circuit Judges.

* Senior Circuit Judge, 6th Circuit, sitting by designation.

**DYER, Circuit Judge:**

In this bankruptcy case, the District Court, on a petition for review filed by claimant Mills Morris Company, sustained the referee in bankruptcy's denial of claimant's reclamation petition and granted the counterclaim of the trustee. The reclamation petition sought to recover eleven air conditioners from the bankrupt King-Porter Company, Inc.'s estate, and the counterclaim prayed for $27,494.07 representing the value of other air conditioners repossessed by claimant a few days before bankrupt filed a voluntary petition in bankruptcy. Finding that claimant perfected a security interest in the property before the bankruptcy petition was filed and that no preferential or fraudulent transfer was made within the meaning of the Bankruptcy Act, we reverse.

On February 14, 1969, a security agreement was executed between bankrupt, an appliance dealer in Hinds County, Mississippi, and claimant, an appliance distributor, granting claimant a security interest in all of bankrupt's inventory. The purpose of the agreement was to secure the payment of purchase money, including any existing and future indebtedness to claimant. The agreement described in detail the various covered appliances, which included air conditioners of the type claimed in this action, and any after-acquired inventory. At the same time, claimant and bankrupt executed financing statements as required by the Mississippi Uniform Commercial Code.[1]

One financing statement was filed February 18, 1969, in the office of the Hinds County Chancery Clerk, and another February 25, 1969, in the office of the Secretary of the State of Mississippi. Both financing statements indicated that the Deposit Guaranty National Bank of Jackson, Mississippi, was the assignee of the secured party.

Pursuant to the security agreement and financing statements, claimant began on February 17, 1969, selling appliances on credit to bankrupt. Each time a sale was made, claimant's agent and employee, Maness, prepared a note and trust receipt[2] covering the appliances of the particular sale, which he purported to execute under a power of attorney given claimant in the security agreement.[3] Claimant and bankrupt continued to transact business in this manner until bankrupt closed its doors May 31, 1969. The trust receipts covering appliances sold February 17 were assigned to the Deposit Guaranty National Bank, but none of the trust receipts covering any subsequent transactions were ever assigned.

On April 15, 1969, Kelvinator Incorporated, an appliance manufacturer, authorized claimant to act as its distributor in Mississippi. Although the written agreement creating the distributorship did not provide for claimant's purchase from Kelvinator of any outstanding accounts receivable, it is undisputed that, as a part of the agreement, claimant assumed liability for these debts to Kelvin-

---

1. Miss.Code Ann. §§ 41A:9–101 to –507 (Spec.U.C.C.Supp.1967), effective March 31, 1968. In this opinion reference is made to the 1966 Official Text and Comments, the relevant sections of which were adopted in Mississippi without modification.

2. A trust receipt, of course, is also a "security agreement." *See* Redisco, Inc. v. United Thrift Stores, Inc., 3 Cir. 1966, 363 F.2d 11, 14. It is not clear whether to secure its interests in the property, claimant believed that these trust receipts were necessary in addition to the security agreement of February 14 or whether they were executed to enable claimant,

should he desire, to conveniently assign chattel paper covering individual shipments to financing institutions.

3. Paragraph ten of the security agreement recites:

Debtor hereby authorizes and empowers any officer or employee of secured party to act on behalf of debtor to prepare, execute, sign and deliver Security Agreements, trust receipts, schedules of wholesale receivables, and any other documents in favor of the secured party covering the collateral and proceeds therefrom, which secured party has sold to debtor pursuant to this Agreement. * * *

ator. The King-Porter accounts had been held by Kelvinator on "open account," affording Kelvinator the status of an unsecured creditor. Kelvinator had intended to create a security interest in the goods sold to bankrupt, but these financing arrangements never materialized.[4]

Explaining the assignment of accounts to claimant, Kelvinator's credit manager testified:

> When we established Appliance Distributors [claimant] as our distributor in Jackson, Mississippi the arrangement made with them was that we would turn over to our distributor all existing air conditioning business that we had, and where we already had made shipments to a dealer we intended to and did issue credit memos to wash out the transaction and rebill that particular shipment to the distributor and he in turn would have the benefit of the gross profits on these particular transactions.

Among the accounts receivable purchased by claimant was the right to payment from bankrupt for the 112 air conditioners Kelvinator sold directly to it under an order placed September 27, 1968, and subsequently shipped March 28, 1969. Claimant was not involved in this original sale.

On May 15, 1969, claimant prepared and purported to execute for bankrupt a trust receipt on these 112 units. This trust receipt was prepared in the same manner as all other trust receipts covering sales made directly to bankrupt.

On May 21, 1969, Kelvinator invoiced claimant for the 112 units previously shipped to bankrupt. On July 2, 1969, claimant accepted trade acceptances drawn by Kelvinator on it for payment of the transfer of the Mississippi business.

On May 31, 1969, claimant repossessed from bankrupt all of the property described in the trust receipts that it could find in bankrupt's possession, including all but eleven of the 112 units subject to this action. On June 5, 1969, King-Porter filed its petition in bankruptcy.

*Perfected Security Interests Under the Uniform Commercial Code*

The "strong-arm" provision of the Bankruptcy Act, section 70c, 11 U.S.C.A. § 110(c), gives to the trustee the status of a lien creditor as of the date of the filing of the petition in bankruptcy.[5] The Uniform Commercial Code [hereinafter cited as U.C.C.] provides that unless a security interest is perfected, it remains subordinate to the rights of a trustee in bankruptcy. U.C.C. § 9–301 (1) (b), (3). Thus a crucial issue in the case is when, if at all, claimant perfected a security interest in the property. It must be kept in mind that the only property involved in the action *sub judice* is the 112 air conditioners shipped by Kelvinator directly to bankrupt March 28, 1969.

A security interest is perfected only after it has "attached" and all the necessary steps required for perfection have been taken. U.C.C. § 9–303(1), Section 9–204(1) of the Code sets out the three required elements for attachment: (1) an agreement that it attach, (2) value given by the secured party, and (3) the debtor must have rights in the collateral.

---

4. Claimant does not challenge the referee's findings on this point. Of course, had Kelvinator perfected a security interest in these goods, claimant, as an assignee of a perfected security interest, would have assumed that right. *See* U.C.C. § 9–302(2).

5. Section 70c provides in pertinent part: The trustee shall have as of the date of bankruptcy the right and powers of: (1) a creditor who obtained a judgment against the bankrupt upon the date of bankruptcy, whether or not such a creditor exists, (2) a creditor who upon the date of bankruptcy obtained an execution returned unsatisfied against the bankrupt, whether or not such a creditor exists, and (3) a creditor who upon the date of bankruptcy obtained a lien by legal or equitable proceedings upon all property, whether or not coming into control or possession of the court, upon which a creditor of the bankrupt upon a simple contract could have obtained such a lien, whether or not such a creditor exists.

The trustee concedes that the security agreement of February 14, 1969, covered all of bankrupt's inventory, thus satisfying the first element, see U.C.C. § 9–105 (1) (b) and 9–203(1) (b), and that the third element was satisfied shortly after March 28, 1969, when bankrupt received the shipment of air conditioners from Kelvinator. See U.C.C. § 2–401. The parties disagree however as to when "value" was given.

## I.

Claimant initially argues that the referee erred in failing to find that value was given for the property in question April 15, 1969, when claimant became obligated to pay Kelvinator the purchase price for the property. The referee's opinion contains two conflicting findings on this issue. At one point he found that claimant gave value by assuming bankrupt's debt to Kelvinator, not April 15, 1969, the date of the agreement, but May 21, 1969, the date Kelvinator invoiced claimant for bankrupt's accounts receivable. At another point, however, the referee found that claimant gave value when it accepted the trade acceptances July 2, 1969. The District Court did not reach this issue, since it based its holding on the finding that the creation of a security interest in the property was a transfer which was both fraudulent and a voidable preference.[6]

■■ We find that the referee was clearly in error. "Value"[7] was given when claimant first extended credit to bankrupt pursuant to the February 14 security agreement. Moreover, value was also given April 15, 1969, when claimant assumed bankrupt's indebtedness to Kelvinator, thereby creating a purchase money security interest in the property.

In Redisco v. United Thrift Stores, Inc., 3 Cir. 1966, 363 F.2d 11, the debtor ordered appliances from Redisco and signed a security agreement naming it as the secured party. At Redisco's request, Kelvinator shipped the appliances by straight bill of lading to the debtor and invoiced Redisco. The court held that although the bill of sales from Kelvinator to Redisco was dated subsequent to the execution date of the security agreement and shipment of the goods, Redisco gave value, as required by the Code, at the time it agreed to sell on credit to the debtor. The advance of credit constituted the value given. Id. at 15.

Under the facts sub judice there was of course no direct sale of the 112 air conditioners from claimant to bankrupt. That sale occurred between Kelvinator and bankrupt September 27, 1968. Pursuant to the security agreement, however, claimant began on February 17, 1969, selling merchandise directly to bankrupt on credit. It was on this date that claimant first advanced value. It was not required for claimant to advance credit on the specific property in question to satisfy the value requirement of section 9–204 (1). The security agreement contained a perfectly valid after-acquired property clause, see U.C.C. § 9–204(3), which specifically covered inventory of the type in dispute. We hold that claimant "gave value" on February 17, 1969, and that a security interest attached in the 112 air conditioners when bankrupt received them shortly after March 28, 1969.[8]

■ The trade acceptances merely represented the method of payment for the accounts purchased. Claimant had already obligated itself on April 15 to pay Kelvinator.[9] In any event, the value

6. These findings are discussed fully infra.

7. "Value" is defined as "any consideration sufficient to support a simple contract." U.C.C. § 1–201(44) (d).

8. Since we hold that a valid security interest was created under the February 14 security agreement, we pretermit review of the question whether the power of attorney given to a claimant in that agreement authorized claimant's execution of the May 15, 1969, trust receipts which purportedly covered the property involved in this dispute.

9. An oral assignment of accounts is fully enforceable, Anaconda Aluminum Co. v. Sharp, 1962, 243 Miss. 9, 136 So.2d 585, 587: see Shell Petroleum Co. v. Yandell, 1935, 172 Miss. 55, 158 So. 787, 789;

given by claimant in no way depended on the form of payment under which claimant obligated itself to Kelvinator.[10]

■ As we have said, while value given by extending credit beginning February 17, 1969, was sufficient under the Code to create a security interest in the property by way of the after-acquired property clause, the value claimant gave bankrupt on April 15, 1969, was also sufficient to create a "purchase money" security interest in the 112 air conditioners.[11] On that day claimant incurred an obligation which gave "value to enable the debtor to acquire rights in or the use of the collateral," U.C.C. § 9–107 (b), by paying Kelvinator the purchase price.[12] Claimant acquired a purchase money security interest even though it was not the original seller. See U.C.C. § 9–107(b), Comment 2.

In other words, the value advanced February 17, 1969, was sufficient to create in the after-acquired property in question a security interest to secure payment of purchase money for all goods sold by claimant directly to bankrupt. Additionally, when claimant purchased bankrupt's accounts, it also acquired a purchase money security interest in the property itself.

## II.

Since claimant's security interest attached when bankrupt received the property, the next inquiry becomes whether the security interest was perfected.

The referee found that since the financing statements indicated that the Deposit Guaranty National Bank was the assignee of claimant's security interest, "claimant was not thereafter covered by these financing statements and * * * [they] did not perfect any security interest. * * *" The referee concluded that, absent proper filing, the security interest was perfected only after claimant took possession of the property on May 31, 1969. See U.C.C. § 9–302 (1) (a).[13] Again, the District Court made no finding on this issue.

It is undisputed that claimant complied with all the requirements under the Code concerning filing. See U.C.C. §§ 9–302, –306, –401, –402, and –403. The referee held, nonetheless, that by noting the name and address of the bank on the financing statements, claimant's security interest lost its perfection. We disagree.

■ First, upon filing a notice of assignment of a security interest under the Code, the designated assignee becomes the secured party of record only. See U.C.C. § 9–405(3). This procedure cannot, nor was it intended to, work a substantive assignment where none was intended by the parties. The fact is that none of the chattel paper covering the property in dispute was ever sold or ever intended to be sold to the bank. Only

---

see also 4 A. Corbin, Corbin on Contracts § 879 (1951), even where consideration supporting the assignment is merely mutual promises. See United States v. Bethlehem Steel Co., 1942, 315 U.S. 289, 298–299, 62 S.Ct. 581, 86 L.Ed. 855; Dovenmuehle, Inc. v. K-Way Associates, 7 Cir. 1968, 388 F.2d 940; Union Central Life Insurance Co. v. Imsland, 8 Cir. 1937, 91 F.2d 365, 370; Curtis v. Blair, 26 Miss. 309.

10. Likewise, May 21, 1969—the date Kelvinator invoiced claimant for the accounts—is of no consequence here. The invoices merely represent cumulative evidence that prior thereto claimant had purchased the accounts.

11. Under certain conditions, purchase money security interests in inventory have

---

priority over conflicting security interests in the same collateral. U.C.C. § 9–312 (3). This issue, however, is not before us.

12. Again, the value here—assumption of bankrupt's debt—would have served as consideration "sufficient to support a simple contract." U.C.C. § 1–201(44) (d). Any benefit to the promisor of a contract, regardless of the amount, is sufficient. See Lowndes Cooperative Association v. Lipsey, 1961, 240 Miss. 71, 126 So.2d 276, 278; In re Sadler's Estate, 1957, 232 Miss. 349, 98 So.2d 863, 868.

13. Although no finding was made regarding the eleven air conditioners not repossessed, ostensibly the referee concluded that a security interest was never perfected in these units.

the chattel paper covering the initial February 17, 1969, sale was ever purchased by the bank. There were no other assignments made, nor was claimant's security interest created under the February 14 security agreement ever assigned. The only substantive effect of the notation of assignment was to give the bank the "right" to file a continuation statement under section 9–403, a termination statement under section 9–404, or a statement of release under section 9–406.

Second, the Code expressly provides that a "financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading." U.C.C. § 9–402(5). This section of the Code was "designed to discourage the fanatical and impossibly refined reading of such statutory requirements in which courts have occasionally indulged themselves." U.C.C. § 9–402, Comment 5; see Silver v. Gulf City Body & Trailer Works, 5 Cir. 1970, 432 F.2d 992.

In this instance no creditor could have been misled by the inclusion in the financing statement that the bank was the secured party of record. Indeed, under the Code's system of "notice" filing, the recorded statements indicate merely that the secured party of record *may* have a security interest in the collateral described. Further inquiry is necessary to disclose the complete state of affairs. U.C.C. § 9–402, Comment 2.

The financing statements here disclosed sufficient information to enable any concerned creditor to contact the bank or claimant. The Code helps only those who help themselves, Silver v. Gulf City Body & Trailer Works, *supra* at 992; see In re Colorado Mercantile Co., D.Colo.1969, 299 F.Supp. 55, 58. Such an inquiry would have revealed that the bank's only security interest was in the six specific items of inventory sold on February 17, 1969. All other inventory was subject to claimant's security interest. *See* U.C.C. § 9–208, Comment 2; *see also* In re Fried Furniture Corp.,

E.D.N.Y.1968, 293 F.Supp. 92, aff'd., 2 Cir. 1969, 407 F.2d 360.

Since the filing requirements of the Code were satisfied before the security interest attached, it perfected at the time of attachment—when claimant received the property from Kelvinator. U.C.C. § 9–303(1).

*Fraudulent and Voidable Preferential Transfers Under the Bankruptcy Act*

The referee found that a "transfer" under section 60a(2) of the Bankruptcy Act, 11 U.S.C.A. § 96(a) (2), occurred when claimant repossessed the property on May 31, 1969; that the transfer was a voidable preference under sections 60a (1) and 60b, 11 U.S.C.A. § 96(a) (1) and (b); and that the transfer was fraudulent under section 67d(2), 11 U.S. C.A. § 107(d) (2). The District Court concurred in the referee's ultimate findings, but on different grounds.

Section 60a(1) of the Act provides:

A preference is a transfer, as defined by this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.

Under section 60b, preferential transfers are voidable if the creditor receiving, or to be benefited by, the preference has, at the time the transfer is made, reasonable cause to believe that the debtor is insolvent.

## I.

Before examining the correctness of the District Court's conclusion that the transfer was preferential and fraudulent, it must be initially determined when the transfer occurred. The referee found that the transfer occurred when claimant repossessed the property. The District Court disagreed and held that it oc-

curred May 30, 1969, when claimant made a certain entry in a "Floor Plan Account" ledger card which was a part of the files maintained on bankrupt. The entry reflected a charge equal to the sum bankrupt owed claimant for the 112 air conditioners. The District Court reasoned that until May 30, 1969, this debt was carried on open account and that the entry constituted a transfer within the meaning of the Bankruptcy Act. We hold that the findings of the Referee and the District Court in this respect are erroneous.

Section 60a(2) provides that

> a transfer of property * * * shall be deemed to have been made or suffered at the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract could become superior to the rights of the transferee.

The referee's determination that the transfer occurred when claimant repossessed the property was based on his concurrent finding that since filing requirements under the Code were not complied with, perfection could not have occurred until the collateral was in claimant's possession. *See* U.C.C. § 9–302(1) (a). Since we have found that perfection occurred shortly after March 28, 1969, when bankrupt received the property, it is clear that the transfer occurred *no later* than that date.

Under the Act, a transfer includes the giving of anything which has "debt-securing power." Pirie v. Chicago Title and Trust Co., 1901, 182 U.S. 438, 443, 21 S.Ct. 906, 45 L.Ed. 1171; Wofford Oil Co. v. Hatcher, 5 Cir. 1934, 73 F.2d 335, 338. It is clear that in the context of the facts *sub judice* the "property" referred to in section 60a corresponds to claimant's security interest in the air conditioners; Rosenberg v. Rudnick, D.Mass.1967, 262 F.Supp. 635, 638; *see* 11 U.S.C.A. § 1(30); 3 W. Collier, Collier on Bankruptcy § 60.51A, at 1050.-15 (14th ed. 1971), and that under section 60a(2) the transfer occurred when the security interest "became so far per-

fected that no subsequent lien upon the [air conditioners] could become superior to the rights of [claimant]." At this point in our inquiry, we must look to Mississippi law to determine the precise time when a transfer occurred. Matthews v. James Talcott, Inc., 7 Cir. 1965, 345 F.2d 374, 378, cert. denied, 382 U.S. 837, 86 S.Ct. 84, 15 L.Ed.2d 79; Rialto Publishing Co. v. Bass, 9 Cir. 1963, 325 F.2d 527, 529. It is important to understand that

> § 60(a) (2) does not make the test of when a transfer occurs one of when the state law may denominate a security interest as perfected. The specific test of § 60(a) (2) is one of when under state law the security interest, however described, becomes one which cannot be defeated by a subsequent lien obtainable in proceedings on a simple contract action. Perfection under state law need not be full perfection but only perfection *so far as* is necessary to meet the test of § 60(a) (2). * * * In this case the security interest was created by the execution of the security agreement * * * and the subsequent compliance with the filing provisions. As of that date the security interest met with the requirements of § 60(a) (2) and the transfer must be regarded as having taken place on that date.

Rosenberg v. Rudnick, *supra*, 262 F.Supp. at 638.

To this end, a transfer, for the purposes of section 60a(2), is equated with the act by which priority over later creditors is achieved and not with the event which attaches or perfects the security interest in a specific item of property. DuBay v. Williams, 9 Cir. 1969, 417 F.2d 1277, 1287.

Thus claimant's filing of the financing statement on February 25, 1969, satisfied section 60a(2) so that its security interest in the 112 air conditioners was "so far perfected" that a transfer is deemed to have occurred on that date, even though it was not until shortly after March 28, 1969, that bankrupt received the goods shipped from Kelvinator. DuBay v. Williams, *supra*, at 1287–

1288; Grain Merchants v. Union Bank & Savings Co., 7 Cir. 1969, 408 F.2d 209, 212–215, cert. denied, France v. Union Bank & Savings Co., 396 U.S. 827, 90 S. Ct. 75, 24 L.Ed.2d 78.

The District Court found that a transfer occurred by a ledger entry on May 30, 1969. The basis for this finding is difficult to understand. The security agreement of February 14, expressly covered inventory of the type involved in this dispute. That agreement included a valid clause providing, in effect, that a security interest would automatically attach in such after-acquired property. *See* U.C.C. § 9–204(3). When claimant purchased the accounts, it had already obtained a perfected security interest in the property, and thus the debt was not on "open account." The notation in the ledger could not have operated to convert the dealings of the parties into a sale on open account. *See* Redisco, Inc. v. United Thrift Stores, Inc., *supra*, 363 F.2d at 14.

## II.

The burden was on the trustee to prove that the transfer was a voidable preference. *See* Inter-State National Bank v. Luther, 10 Cir. 1955, 221 F.2d 382, 390–391, cert. dismissed, 1956, 350 U.S. 944, 76 S.Ct. 297, 100 L.Ed. 823. There can be no preference under section 60a(1) in the absence of any one of the statutory elements. Clark v. Mutual Lumber Co., 5 Cir. 1953, 206 F.2d 643, 646–647. It was therefore necessary for the trustee to prove, *inter alia*, that the transfer was made for or on account of an antecedent debt.

The referee found, as previously indicated, that the transfer occurred on May 31, 1969, when claimant repossessed most of the property.[14] He also found that the transfer was for an antecedent debt created by the trust receipts prepared May 15, 1969. Again, the District Court parted company with the referee and held

that since bankrupt's indebtedness on open account began with the initial purchase of inventory goods from claimant on February 17, 1969, the transfer of May 30, 1969—claimant's entry in the floor plan ledger card—was on account of an antecedent debt. We disagree.

As previously discussed, we find that the transfer occurred February 25, 1969, when claimant completed the filing requirements under the Code. While it is true that transfers not made for present consideration are generally classified as having been made on account of an antecedent debt, Dean v. Davis, 1917, 242 U.S. 438, 443, 37 S.Ct. 130, 61 L.Ed. 419; *see* Matthews v. James Talcott, Inc., *supra*, 345 F.2d at 379; Adams v. City Bank & Trust Co., 5 Cir. 1940, 115 F.2d 453, 454, cert. denied, 1941, 312 U.S. 699, 61 S.Ct. 739, 85 L.Ed. 1133; Barr and Creelman Mill & Plumbing Co. v. Zoller, 2 Cir. 1940, 109 F.2d 924, 926; In re Hygrade Envelope Corp., E.D.N.Y. 1967, 272 F.Supp. 451, 458, rev. on other grounds, 2 Cir. 1968, 393 F.2d 60, cert. denied, Gibraltar Factors Corp. v. Baronaw, 393 U.S. 837, 89 S.Ct. 114, 21 L. Ed.2d 108; Cumberland Portland Cement Co. v. Reconstruction Finance Corp., E.D.Tenn.1953, 140 F.Supp. 739, 753, aff'd., Ralph Rogers & Co. v. RFC, 6 Cir. 1956, 232 F.2d 930, section 9–108 of the Code provides:

> Where a secured party makes an advance, incurs an obligation, releases a perfected security interest, or otherwise gives new value which is to be secured in whole or in part by after-acquired property his security interest in the after-acquired collateral shall be deemed to be taken for new value and not as security for an antecedent debt if the debtor acquires his rights in such collateral either in the ordinary course of his business or under a contract of purchase made pursuant to the security agreement within a reasonable time after new value is given.[15]

14. *See* note 13 *supra*.

15. There can be no doubt but what the property in question was acquired by

bankrupt in the ordinary course of his business.

The critical issue then is whether the Bankruptcy Act collides with section 9–108 of the Code.

■■■■■ The Uniform Commercial Code has been adopted in all but one state. It should generally be considered as the federal law of commerce—including secured transactions. *See* Fruehauf Corp. v. Yale Express System, 2 Cir. 1966, 370 F.2d 433, 437; United States v. Wegematic Corp., 2 Cir. 1966, 360 F. 2d 674, 676. Thus section 9–108 should be read in harmony with the Bankruptcy Act if at all possible. Furthermore, section 9–108 is generally accepted and in accord with current business practice and understanding and hence should be applied in bankruptcy proceedings. Rosenberg v. Rudnick, *supra*, 262 F.Supp. at 639. There exists no legally valid reason, absent a contrary command in the Bankruptcy Act, why the disposition of creditors' claims in bankruptcy proceedings should not also be in accord with current business practice and understanding. As so aptly stated by Judge Solomon in In re Portland Newspaper Publishing Co., D.Or.1967, 271 F.Supp. 395: "Good business practice should be good business law." *Id.* at 400.[16]

In keeping with this view, the bankruptcy courts must recognize the general validity of claims based on security interests created by after-acquired property clauses. Cf. Irving Trust Co. v. Allen, 7 Cir. 1959, 272 F.2d 197, 200. No inference can be drawn from the evidence in the record that the transfer favored claimant over other creditors. Claimant's security interest in the property was easily ascertainable by any creditor who examined either of the financing statements on file with the Mississippi Secretary of State and the Hinds County Chancery Clerk. After the financing statements were filed, no creditor could have been misled into believing that bankrupt's inventory could have provided assets with which to satisfy debts arising out of extensions of credit. DuBay v. Williams, *supra*, 417 F.2d at 1289. Moreover, potential creditors could have protected themselves, if they so desired, by perfecting a purchase money security interest under section 9–312(3).

Nothing in the legislative history of the Bankruptcy Act reveals that claims created under the "floating lien" method of financing should invariably meet defeat in a bankruptcy court. Grain Merchants v. Union Bank & Savings Co., *supra*, 408 F.2d at 214.[17] On the contrary, Congress approved this important type of financing where unsecured creditors had *record notice* of the existence of financing agreements to which the debtor was a party. *Id.*

If we were to adopt trustee's construction of section 60, "we would defeat, not implement, Congress' intent, and we would impair, not promote, the intent of the draftsmen of the Uniform Commercial Code to make security transactions conform to the legitimate needs of commerce." DuBay v. Williams, *supra*, 417 F.2d at 1289; *see* Fruehauf Corp. v. Yale Express System, *supra*, 370 F.2d at 437.

■■■■ We hold that claimant's security interest in the after-acquired air conditioners was not a transfer on account of an antecedent debt. DuBay v. Williams, *supra*, 417 F.2d at 1288–1289; Grain

---

16. See Henson, "The Interpretation of the Uniform Commercial Code: Article 9 in the Bankruptcy Courts," 22 Miami L. Rev. 101, 113–120 (1967); Note, 44 Tex. L.Rev. 1369 (1966).

17. The legislative history of section 60a is clear. In recommending the adoption of the 1950 version of the bill, the House Committee on the Judiciary reported that confusion [had] cast grave doubt upon the validity of normal business security, in all of the areas covered by trust receipts, factors liens, oil leases, cattle loans, airplane-equipment financing, chattel mortgages, assignments of accounts receivable, conditional sales agreements for realty, etc. Indeed, a bank officer, who appeared as one of the witnesses at the subcommittee hearing testified that the situation had come to such a pass that his institution was compelled to regard all such types of transactions as unsecured loans. * * * U.S.Code Cong.Serv., 1950, vol. 2, 81st Cong., 2d Sess., pp. 1985–1986.

Merchants v. Union Bank & Savings Co., *supra*, 408 F.2d at 216.[18]

Finally, the ultimate finding of the referee and District Court that the transfer was fraudulent gives us little pause. Since we have already held that claimant gave value before the transfer occurred, it is clear that the transfer was not "without fair consideration." *See* Bankruptcy Act, § 67d(2). Thus, in view of our previous discussion, the question of a fraudulent transfer does not arise.

The order of the District Court is reversed and the case is remanded with directions to enter an order granting claimant's reclamation petition and dismissing trustee's counterclaim.

Reversed and remanded with directions.

---

18. It would serve no useful purpose to discuss the common-law theories devised and applied to avoid the claims of trustees and other creditors. Such legal fictions include, for example, (1) the "entity" theory, *see, e. g.,* DuBay v. Williams, *supra,* 417 F.2d at 1287 n. 8; Manchester National Bank v. Roche, 1 Cir. 1951, 186 F.2d 827, 831; In re White, S.D.Ohio 1967, 283 F.Supp. 208, 210; In re Portland Newspaper Publishing Co., *supra,* 271 F.Supp. at 399–400; Rosenberg v. Rudnick, *supra,* 262 F.Supp. at 639; (2) the "substitution" theory, *see, e. g.,* In re Pusey, Maynes, Breish Co., 3 Cir. 1941, 122 F.2d 606; (3) the "relation back" theory, see, *e. g.,* DuBay v. Williams, *supra,* 417 F.2d at 1287–1288; *but see* Corn Exchange Bank v. Klauder, 1943, 318 U.S. 434, 438 n. 11, 63 S.Ct. 679, 87 L.Ed. 884; Porter v. Searle, 10 Cir. 1955, 228 F.2d 748, 755; and (4) the "sophisticated res" theory, *see, e. g.,* DuBay v. Williams, *supra.*