388 F.2d 940
 DOVENMUEHLE, INC., an Illinois corporation, Plaintiff-Appellee,
v.
K-WAY ASSOCIATES, a New York limited partnership, Frederick W. Kretzer, William Kretzer, Murray S. Levine and Donald Levine, Defendants-Appellants.
 No. 16109.
 United States Court of Appeals Seventh Circuit.
 January 10, 1968.
 Rehearing Denied February 7, 1968.
 
 Charles Levin, Hammond, Ind., Irwin I. Zatz, Chicago, Ill., Arvey, Hodes & Mantynband, Chicago, Ill., of counsel, for appellants.
 Edwin A. Rothschild and Thomas C. Homburger, Chicago, Ill., Sonnenschein, Levinson, Carlin, Nath & Rosenthal, Chicago, Ill., of counsel, for appellee.
 Before SCHNACKENBERG, KILEY and CUMMINGS, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 In this diversity action, Dovenmuehle, Inc., a Chicago-based mortgage banking concern, sued K-Way Associates, a New York limited partnership, and four general partners to recover a 1% service fee and various expenditures. After a bench trial, the District Court entered detailed findings of fact and conclusions of law in plaintiff's favor and dismissed defendants' counterclaim. We agree with this disposition.
 
 
 2
 The findings, reflecting the record, reveal these facts: Prior to March 1963, defendants planned to erect two shopping centers in Arizona. They had acquired Hayden Plaza East in Tempe and had obtained an option to purchase Hayden Plaza West in Phoenix. They also had entered into a lease with Woolco, F. W. Woolworth Company's leasing corporation, providing for Woolco and Woolworth to be a major tenant of both shopping centers.
 
 
 3
 On March 1, 1963, defendants applied to Dovenmuehle for mortgage financing. These loan applications were for $4,800,000. The applications provided a 1% service fee for Dovenmuehle, 1% if defendants did not perform, and a 1% good faith deposit. The applications were subject to Dovenmuehle's ability to arrange a $500,000 loan to K-Way for the purchase of Hayden Plaza West and for construction at Hayden Plaza East. These applications were not approved by Dovenmuehle in the space provided. The approval line on each application read:
 
 
 4
 "Assigned W.J.H. [William J. Hoppe] Approved (1) * * * (2) * * *."
 
 
 5
 In March and April or May 1963, defendants borrowed a total of $500,000 from the First National Bank of Albuquerque, New Mexico, to purchase Hayden Plaza West and to commence construction on Hayden Plaza East.
 
 
 6
 On April 23, 1963, defendants applied to New York Life Insurance Company for loans on these two properties in the total amount of $4,700,000. The applications provided that the defendants would pay New York Life 1% of the amount of the loans if defendants should not accept a commitment issued by New York Life. These applications were endorsed by Dovenmuehle as broker but were not approved by New York Life. Dovenmuehle is a correspondent of New York Life. From time to time, Dovenmuehle tenders proposed loans to New York Life for their acceptance. After New York Life purchases loans, Dovenmuehle services them for a fee paid by New York Life.
 
 
 7
 On May 31, 1963, Dovenmuehle obtained a commitment from New York Life to advance a first mortgage loan of $3,525,000 (or, alternatively, $4,400,000 on additional conditions) on the two Arizona shopping centers. One of the conditions of the commitment was that K-Way must first obtain certain leases in both centers. The commitment required Dovenmuehle to deposit a $22,200 check and a $22,200 note payable to New York Life to serve as liquidated damages in the event of default. May 1, 1964, was the expiration date of this commitment.
 
 
 8
 On June 3, 1963, Dovenmuehle wrote K-Way and agreed to make either the $3,525,000 or $4,400,000 mortgage "On the basis of compliance by K-Way Associates with the conditions set forth" in New York Life's May 31, 1963, attached letter to Dovenmuehle. Dovenmuehle agreed to supply "interim construction funds" to K-Way when the conditions of New York Life's May 31 commitment were fulfilled by K-Way. In its letter to K-Way, Dovenmuehle adverted to New York Life's requirement of a cash deposit of $22,200 and a $22,200 promissory note. In this connection, Dovenmuehle specifically referred K-Way to the liquidated damages provision contained in New York Life's May 31, 1963, commitment. Dovenmuehle's letter also stated that its service fee in procuring New York Life's commitment would be $44,400 (1% of the loan) plus travel expenses and counsel fees and disbursements. Dovenmuehle required from K-Way a $22,200 check and a $22,200 note, both payable to New York Life. The check and note were in turn to be deposited with New York Life under the liquidated damage provision contained in its May 31, 1963, commitment to Dovenmuehle. Defendants accepted the Dovenmuehle commitment on June 6, 1963, and sent Dovenmuehle the prescribed check and note payable to New York Life. On June 10, 1963, Dovenmuehle in turn accepted the New York Life commitment.[1]
 
 
 9
 On July 17, 1963, Dovenmuehle sent K-Way a detailed report listing the unfilled conditions that would have to be met before New York Life's $3,525,000 loan would issue. Defendants did not comply with these conditions. However, in July 1963, with Dovenmuehle's consent and cooperation, defendants used the 1963 commitments of Dovenmuehle and New York Life to obtain a $4,400,000 construction loan from Valley National Bank of Phoenix, Arizona.
 
 
 10
 On August 6, 1963, Dovenmuehle submitted a "superseding" commitment letter, providing, inter alia, that the conditions of New York Life's commitment letter of May 31, 1963, were applicable to K-Way. Defendants accepted this superseding commitment on August 9, 1963. Dovenmuehle's August 6 commitment did not provide for any interim construction loan to K-Way, for K-Way had already received such a loan, in the sum of $4,400,000, from Valley National Bank of Phoenix.
 
 
 11
 After the issuance of the 1963 commitments, Dovenmuehle explained to defendants that the 1%, or $44,400, deposited with New York Life would be retained by that company as liquidated damages in the event of default. Dovenmuehle also explained that an additional 1% fee and certain expenses were due from K-Way as Dovenmuehle's charge for procuring the New York Life commitment.
 
 
 12
 From January through March 1964, defendants admitted that they would be unable to meet the conditions of the 1963 commitment before its May 1, 1964, expiration date. On March 24, 1964, K-Way requested Dovenmuehle to negotiate an increase in the mortage commitment to $4,865,000 and an extension until November 15, 1964.
 
 
 13
 On April 28, 1964, Dovenmuehle was able to obtain a New York Life commitment for a $4,640,000 mortgage on the two shopping centers. The new deadline for meeting New York Life's conditions was November 15, 1964. The commitment required an additional $2,000 as liquidated damages.
 
 
 14
 The next day Dovenmuehle issued its commitment letter to K-Way, agreeing to make the mortgage loan "On the basis of compliance by K-Way Associates with the conditions set forth" in the April 28, 1964, commitment letter of New York Life Insurance Company, Dovenmuehle's commitment stated that those conditions "shall apply to K-Way Associates." Dovenmuehle's letter called defendants' attention to the liquidated damages provision of New York Life's commitment and stated:
 
 
 15
 "By your acceptance of this commitment letter you agree that the second paragraph on Page 4 of the New York Life Insurance Company [April 28, 1964] commitment letter relating to the liquidated damage obligation is incorporated herein by reference and is made a part hereof, and that the obligation therein shall apply to the payment of the $44,400 heretofore made by you, as well as to the additional $2,000 you are returning along with the accepted copy of this commitment."
 
 
 16
 Dovenmuehle's April 29 letter also advised K-Way that it was to pay Dovenmuehle a 1% (or $46,400) fee for procuring the initial and subsequent commitments, with Dovenmuehle's travel expenses, outside counsel's $10,000 fee and expenses also to be paid by defendants.
 
 
 17
 On May 1, 1964, K-Way accepted the new commitment and arranged for the additional $2,000 in liquidated damages to be forwarded to Dovenmuehle from defendants' New York Office.
 
 
 18
 In August 1964, defendants acknowledged their obligation to pay Dovenmuehle its 1% service fee but told Dovenmuehle that they could not afford to pay the fee at that time.
 
 
 19
 Defendants were unable to meet the lease requirements of the April 28, 1964, New York Life commitment and were still in default on the November 15, 1964, expiration date thereof. New York Life terminated its commitment on November 17, 1964, and retained as its liquidated damages the $46,400 that had been deposited with it.
 
 
 20
 Defendants refused to pay Dovenmuehle the following amounts:
 
 
 21
 $46,400.00 (or 1% of the loan) for
 Dovenmuehle's services in
 procuring the commitments
 935.11 for Dovenmuehle travel expenses
 10,000.00 for services of Dovenmuehle's
 outside counsel
 454.58 for disbursements of outside
 counsel
 __________
 $57,789.69
 __________
 
 
 22
 The District Court entered judgment for Dovenmuehle in this amount. This appeal followed.
 
 
 23
 The defendants' three-count counterclaim was dismissed by the District Court. Defendants insist that under Count I of the counterclaim they are entitled to $400,000 damages for increased construction costs resulting from Dovenmuehle's alleged failure to make "front money" and construction loans to K-Way. The other counts of the counterclaim are no longer pressed.
 
 
 March 1963 Mortgage Applications
 
 
 24
 K-Way first argues that its March 1, 1963, signed applications to Dovenmuehle for mortgage financing constituted binding contracts between K-Way and Dovenmuehle. The trial court held to the contrary and we agree that there was substantial evidence to support its factual findings that Dovenmuehle did not accept these offers. Therefore, its conclusion, based on such findings, that there were no contracts cannot be set aside. Greiner v. Chicago and Eastern Illinois Railroad Company, 360 F.2d 891, 895 (7th Cir. 1966). Our examination of both applications shows that the approval line in each was left blank by Dovenmuehle. The trial court saw the witnesses and chose to believe Dovenmuehle Vice Chairman William J. Hoppe's testimony that he did not promise to produce the requested $4,800,000 loans and that he had advised defendants that Dovenmuehle was still negotiating with New York Life for the loan that was eventually offered to K-Way. Consistently with the blank approval line on each application, Hoppe also testified that these applications had never been approved by Dovenmuehle. Consequently, it is immaterial that Hoppe and K-Way partners Frederick W. Kretzer and Donald Levine initialed various changes in the applications. The evidence is surely sufficient to support the District Court's finding that Dovenmuehle had not accepted or approved the March 1963 applications, thus justifying the conclusion that they were not contracts.
 
 
 25
 Defendants rely on Calo, Inc. v. AMF Pinspotters, Inc., 31 Ill.App.2d 2, 176 N.E.2d 1 (1961), but there the nonsigning offerees were held bound because offer. Here, as seen, the District Court's their acts showed their acceptance of the contrary finding is permissible on this record. Banking-Trading Corporation v. Floete, 257 F.2d 765, 769 (2d Cir. 1958). In the two other Illinois cases relied upon by defendants, the parties had signed the contracts with the intention of binding themselves. See First National Bank of Elgin v. Husted, 57 Ill.App.2d 227, 205 N.E.2d 780 (1965), and Fink v. Schleuter, 206 Ill.App. 159 (1917). As stated in 1 Williston on Contracts (3d Ed.1957) § 22a, the courts should "guard against abuse of this doctrine [implying consent] as a means of thrusting contracts upon people." Since we are not disturbing the District Court's conclusion that the March 1963 applications were not contracts, we need not consider defendants' ensuing argument that under these "contracts" they had only agreed to pay Dovenmuehle a service fee of 1% of the loans and nothing else to Dovenmuehle or New York Life.
 
 
 1964 Obligations of Defendants
 
 
 26
 Stating that they were already bound by the March 1963 "contracts," defendants next contend that there was no consideration for their May 1, 1964, agreement to deposit $46,400 as liquidated damages for New York Life and also to pay Dovenmuehle's travel expenses and its outside counsel's $10,000 fee and expenses, all pursuant to Dovenmuehle's commitment letter of April 29, 1964. This contention cannot be accepted, for it is based on the untenable ground that the March 1963 applications constituted contracts. Since they were properly held not to be contracts, there was consideration for K-Way's May 1st assent to the terms of Dovenmuehle's April 29th commitment letter. Thus Dovenmuehle's promises in that letter were of course sufficient consideration for K-Way's assent to the conditions imposed therein. Defendants do not dispute the District Court's finding that no duress was exerted on them.
 
 
 27
 Defendants urge that even under the Dovenmuehle commitment letter of April 29, 1964, accepted by K-Way on May 1, 1964, they were not obligated to pay both a 1% liquidated damage fee to New York Life and a 1% service fee (plus various expenses) to Dovenmuehle. Defendants certainly intended to deposit $46,400 with New York Life as liquidated damages, for they transmitted a $22,200 check and a $22,200 note, both payable to New York Life, to Dovenmuehle for transmittal to New York Life.[2] As to the additional $2,000, defendants sent Dovenmuehle a check in that amount, and Dovenmuehle agreed in its April 29, 1964, commitment letter to forward its $2,000 check to New York Life for the balance of the liquidated damage obligation. These deposits were in compliance with the plain terms of the April 29, 1964, Dovenmuehle commitment letter as accepted by defendants on May 1. That letter stated:
 
 
 28
 "On the basis of compliance by K-Way Associates with the conditions set forth in the attached [April 28, 1964] commitment letter of the New York Life Insurance Company, Dovenmuehle, Inc. agrees to make to K-Way Associates the mortgage described therein. It is to be understood that the conditions as set forth in the attached New York Life Insurance Company commitment, although addressed to Dovenmuehle, Inc., shall apply to K-Way Associates."
 
 
 29
 Those conditions included a deposit of $46,400 with New York Life as liquidated damages. Defendants' May 1 acceptance, of course, made these conditions applicable to them.
 
 
 30
 K-Way's obligation to deposit $46,400 liquidated damages with New York Life was made even plainer by the following two paragraphs of Dovenmuehle's April 29 commitment letter:
 
 
 31
 "As you will note, from the second paragraph on Page 4 of the attached New York Life Insurance Company [April 28, 1964] commitment, New York Life Insurance Company requires from Dovenmuehle, Inc. a cash deposit of $46,400, which will be the amount of the liquidated damages in case the loan transaction is not closed. You will further note that New York Life Insurance Company acknowledges that it has in hand the sum of $44,400 and requests a Dovenmuehle, Inc. check in the amount of $2,000 for the balance of the liquidated damage obligation. We should appreciate it if you will forward to us your check in the amount of $2,000, payable to Dovenmuehle, Inc., and we, in turn, will forward our check in a like amount to the New York Life Insurance Company.
 
 
 32
 "By your acceptance of this commitment letter you agree that the second paragraph on Page 4 of the New York Life Insurance Company commitment letter relating to the liquidated damage obligation is incorporated herein by reference and is made a part hereof, and that the obligation therein shall apply to the payment of the $44,400 heretofore made by you, as well as to the additional $2,000 you are returning along with the accepted copy of this commitment."
 
 
 33
 In our view, there is no ambiguity in the liquidated damage requirements or in their applicability to defendants.
 
 
 34
 Conceding that they were bound to pay a 1% service fee to Dovenmuehle,[3] defendants nevertheless contend that their acceptance of the April 29 commitment did not bind them to pay anything else to Dovenmuehle. This contention is punctured by the following language of the April 29 Dovenmuehle commitment accepted by defendants:
 
 
 35
 "All fees and expenses specifically required by the New York Life Insurance Company are to be paid by the borrower [K-Way], with the total of such fees and expenses not to exceed $2,500.[4] The fee to be paid by K-Way Associates to Dovenmuehle, Inc. for its services in procuring the initial commitment and the subsequent increase, as indicated by the attached New York Life Insurance Company commitment, will be $46,400. In addition, all travel expenses of Dovenmuehle, Inc. personnel in connection with this transaction, both to Phoenix and to New York, are to be paid by the borrower. In addition thereto, the borrower agrees to pay for the services of Dovenmuehle, Incorporated's outside counsel, Frank C. Bernard, the sum of $10,000 plus all his disbursements including, but not limited to, telephone calls, travel expenses, mimeographing and photostating."
 
 
 36
 The April 29 letter required defendants to deposit $46,400 with New York Life as potential liquidated damages. The defendants satisfied this obligation.[5] The April 29 letter also obligated them to pay plaintiffs a service fee of 1% on the loans committed, namely, $46,400, as well as certain travel expenses of Dovenmuehle's personnel, and the $10,000 fee of Dovenmuehle's outside counsel, together with his disbursements. Having only paid the $46,400 liquidated damages held by New York Life, the defendants must now pay Dovenmuehle the other obligations which they assumed on May 1st. These total $57,789.69.[6]
 
 
 Counterclaim
 
 
 37
 In Count I of their counterclaim, defendants have sued to recover $400,000 for allegedly higher construction costs because Dovenmuehle did not provide a $200,000 "front money" Hayden Plaza East construction loan and a subsequent $4,400,000 construction loan. The trial court was entitled to credit Mr. Hoppe's denials of promising such funds or of urging defendants to commence construction. He testified that one of the reasons Dovenmuehle reduced its service fee from 2% to 1% was because defendants intended to do their own construction financing. Defendants admit that Dovenmuehle "helped arrange the $200,000 temporary construction loan" obtained from the First National Bank of Albuquerque in April or May 1963. They used Dovenmuehle's and New York Life's 1963 commitments to obtain a $4,400,000 construction loan from the Valley National Bank of Phoenix in August 1963. Furthermore, in May 1963, Dovenmuehle had obtained for defendants a $4,400,000 mortgage commitment from New York Life, increased to $4,640,000 in April 1964. This amount was held available to defendants for almost eighteen months, until November 17, 1964. Since the March 1, 1963 applications never became contracts, defendants could not assume that the final commitments from New York Life and Dovenmuehle would not impose any conditions with respect to leases at the two shopping centers. Such conditions would certainly be normal in connection with loans of this magnitude and were not negated in Dovenmuehle's May 9, 1963, letter to the First National Bank of Albuquerque supporting defendants' request for a $200,000 Hayden Plaza East construction loan.[7] According to defendants' brief, construction started in April 1963, so that there was no reliance on the May 9th letter, and Dovenmuehle's June 3, 1963, commitment letter advised defendants that it would not supply interim construction funds until New York Life's leasing and other conditions were fulfilled by defendants. Furthermore, experienced businessmen like K-Way's partners could foresee that it might take a few months to process the applications. Only defendants' failure to provide the required leases prevented it from procuring this money from New York Life. The record does not support their charges that Dovenmuehle breached any commitment to them. Therefore, Wheeler v. White, 398 S.W.2d 93 (Tex. Sup.Ct.1965), is inapplicable.
 
 
 38
 Count I of the counterclaim is based on a promissory estoppel theory entitling the promisee to recover if the promise induced detrimental action. See 1 Restatement of the Law of Contracts, § 90. However, the trial court could properly credit Hoppe's denials of promises of Dovenmuehle construction loans. Additionally, Illinois requires fraud or intent to deceive before there can be recovery under a promissory estoppel theory. Hughes v. Encyclopoedia Brittanica, Inc., 1 Ill.App.2d 514, 521, 117 N.E.2d 880 (1954), leave to appeal denied; Bredemann v. Vaughan Mfg. Co., 40 Ill.App.2d 232, 249, 188 N.E.2d 746 (1963). Defendants adduced no such proof. Accordingly, the dismissal of Count I of the counterclaim was justified.[8] The other two Counts of the counterclaim have been abandoned.
 
 
 39
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 In late June 1963, at the request of New York Life, Dovenmuehle substituted its $22,200 check and $22,200 note for K-Way's check and note. K-Way delivered to Dovenmuehle its check and note in like amounts, payable to Dovenmuehle. The liquidated damages deposit was to be returned to K-Way if it procured the leases required by the commitment instead of defaulting
 
 
 [2]
 See note 1, supra. As late as February 1964, according to correspondence of record, all parties considered the deposits with New York Life to be K-Way's and not Dovenmuehle's
 
 
 [3]
 This concession accords with defendants' August 1964 admission that they were then financially unable to pay Dovenmuehle's fee
 
 
 [4]
 We are advised that New York Life did not bill for any fees and expenses. Defendants argue that the limitation of New York Life's "fees and expenses" to $2,500, as provided in the above-quoted paragraph of the April 29 commitment letter, extends to any liquidated damage obligation of defendants. Even assuming that liquidated damages could be considered New York Life's "fees and expenses," defendants assumed the later obligation to deposit $46,400 with New York Life as liquidated damages. This obligation would cancel the $2,500 limitation, as acknowledged by defendants' payment of the deposit. The argument is clearly without merit
 
 
 [5]
 Defendants argue that the liquidated damage clause is invalid, but, through Dovenmuehle, they have already paid $46,400 to New York Life under that clause. If defendants wish to test the validity of the clause, their remedy is against New York Life. Whatever sums defendants have paid to New York Life cannot lessen any obligations to Dovenmuehle under the other clauses of the April 29 Dovenmuehle letter
 
 
 [6]
 The $57,789.69 consists of the following items: $46,400 for Dovenmuehle's 1% service fee in obtaining New York Life's commitments; Dovenmuehle's travel expenses of $935.11; Dovenmuehle's outside counsel's fee of $10,000 and his disbursements of $454.58
 
 
 [7]
 This letter is relied upon in the dissenting opinion, infra, p. 952
 
 
 [8]
 The dissenting opinion upholds the dismissal of the counterclaim on a basis which we do not reach
 
 
 
 40
 SCHNACKENBERG, Circuit Judge (dissenting in part and concurring in part).
 
 
 41
 K-Way Associates, a New York limited partnership, Frederick W. Kretzer, William Kretzer, Murray S. Levine and Donald Levine, defendants, appeal from a judgment of the district court entered December 13, 1966, in favor of Dovenmuehle, Inc., an Illinois corporation, and from an order denying their motion for a new trial. Following a trial without a jury, the judgment was entered in an action brought by plaintiff against defendants to recover a fee of $46,400, travel expenses of $935.11, outside counsel services of $10,000 and disbursements of $454.58, or a total of $57,789.69. The judgment was for this amount and thereby defendants' counterclaim was dismissed at their costs.
 
 
 42
 Defendants' answer denied that said amounts were owing to plaintiff, averred that Dovenmuehle had already been paid a 1% fee of $46,400 and set forth there was no consideration to support plaintiff's claim for both a 1% fee plus an additional 1% liquidated damage obligation and additional costs, expenses and counsel fees. In addition, defendants, in count I of a counterclaim, sought to recover as damages, increased construction costs resulting from work stoppages and interruptions due to Dovenmuehle's failure to provide promised construction funds, after K-Way had begun construction in reliance on the promises and representations of Dovenmuehle that "front money" and construction financing was forthcoming in the amounts requested by defendants. No evidence was offered as to counts II and III of the counterclaim.
 
 
 43
 Plaintiff was engaged in a general mortgage banking business in Chicago, Illinois. K-Way Associates was a builder and developer of shopping centers. Its general partners were Frederick W. Kretzer, William Kretzer, Murray S. Levine and Donald Levine, all residents of states other than Illinois. The matter in controversy exceeds $10,000.
 
 
 44
 About March 1, 1963, William J. Hoppe, board vice-chairman of Dovenmuehle, and Frederick W. Kretzer (hereinafter referred to as "Kretzer"), and Donald Levine (sometimes herein referred to as "Levine"), met at Phoenix, Arizona, and Hoppe stated that an appraisal of K-Way's land there had been procured and that it was sufficient to justify a $500,000 loan. Kretzer and Levine stated that $500,000 "front money" was promptly required to pick up K-Way's option on the Hayden Plaza West and to start construction to meet Woolco's[1] lease occupancy date. They then also discussed permanent financing which would eventually total $5,100,000. Answering an inquiry by Kretzer and Levine, Hoppe told them that Dovenmuehle's charges for procuring the loan would be 1% thereof, to be deposited with Dovenmuehle, which would "convert" to its fee for producing the loan, whether or not the loan was completed by K-Way. About three days later, Hoppe returned with two printed Dovenmuehle documents, each dated March 1, 1963, entitled "Application for Loan", and addressed to Dovenmuehle.[2] Both applications provided that "major leases will be assigned as additional collateral" and contained the following agreement as to Dovenmuehle's compensation for its services in producing the loans:
 
 
 45
 "You are authorized to pay and deduct from the proceeds of the loan the following:
 
 
 46
 * * * * * *
 
 
 47
 "(6) The fee stated in this application due you for making the loan.
 
 
 48
 "If after approval of this application by you, examination should disclose that any of the representations made by the undersigned are not correct or if material facts have not been disclosed, you may cancel your approval and no liability of any kind shall attach to you by reason thereof. In such event, or if after approval the undersigned fails to complete the loan or perform all the terms of this contract within 60 days from the date hereof, the undersigned agrees to pay 1% of the amount of the loan requested for services rendered by you and to pay the expense incident to the examination of the title.
 
 
 49
 "Applicant will remit a good faith deposit of * * * with the executed application; said deposit to be returned to the applicant in the event Dovenmuehle, Inc. does not consummate the loan."
 
 
 50
 These two writings were signed by Kretzer and Levine on behalf of K-Way. Mr. Hoppe placed his initials in several places in the margin where he had made written changes, including a change from "2%" to read "1%" of the amount of the loan (which K-Way agreed to pay for Dovenmuehle's services).
 
 
 51
 Other than the 1% fee for services, the execution by K-Way of a mortgage, and the requirement that "major leases * * * be assigned as additional collateral" to secure repayment, there were no further obligations or undertakings required of K-Way in connection with said loans.
 
 
 52
 Performance by the parties commenced immediately. Hoppe took the applications and Dovenmuehle undertook to obtain from New York Life Insurance Company, the loans requested by K-Way.
 
 
 53
 In the latter part of March, 1963, and several times thereafter, Levine and Kretzer asked Hoppe when the $500,000 front money loan would be made. Each time Hoppe was reminded by them of the urgency for this money to pick up the Hayden Plaza West land option and to start construction under the lease K-Way made with Woolco. Although Hoppe had at first stated the "front money" was coming through soon, he later became indefinite and would give no date for the pay out of this money. About March 18, 1963, and again a week later, Levine asked Hoppe when the front money loan would be forthcoming, and the response was, "we are working on it now. It will be forthcoming soon. It will either be with Dovenmuehle's own funds or with a combination of our funds and customer funds". With the expiration of the option on Hayden Plaza West nearing, defendants on their own financial responsibility, borrowed $300,000 from the First National Bank in Albuquerque, with which to pick up the option on Hayden Plaza West.
 
 
 54
 Early in April, 1963, Hoppe was again asked by Kretzer and Levine about the status of the loans. He was told that it was imperative for K-Way to start construction to meet the Woolco lease occupancy date. Hoppe told Kretzer to start construction. In his conversation with Levine, Hoppe stated that the New York Life commitment "is in the works" and "it looks very good." Hoppe continued that he was completely assured that the commitment was coming through as requested without problems. Levine asked Hoppe if it was safe to start construction. Hoppe replied:
 
 
 55
 "I will take care of the financing end; that is my problem. It is safe for you to commence construction. Go ahead and take care of your Woolco commitments."
 
 
 56
 In reliance thereon, in April 1963, K-Way entered into construction contracts and contracts for materials, and started the construction of the Woolco store.
 
 
 57
 On or about April 23, 1963, Dovenmuehle sent K-Way two New York Life Insurance Company mortgage loan applications — one for a loan of $2,600,000 on Hayden Plaza East and the other for a loan of $2,100,000 on Hayden Plaza West. Dovenmuehle signed said applications as broker and K-Way signed as applicant.
 
 
 58
 On April 24, 1963, Hoppe wrote Kretzer as to the status of the loans and stated:
 
 
 59
 "Verbally they [New York Life] assured me that their commitment will come through in the amount requested, with the possibility that they will make a combined loan of $4,700,000, rather than two separate loans."
 
 
 60
 Subsequently a verbal request was made of Hoppe by K-Way for the $200,000 balance of the "front money," which was needed by K-Way to carry on construction. Hoppe said he had made headway with the Phoenix Title and Trust Company and suggested K-Way go there for this money. Negotiations were conducted by K-Way with Phoenix Title and Trust, but no loan was consummated with it.
 
 
 61
 In May, 1963, with the assistance of Dovenmuehle, K-Way obtained a $200,000 temporary construction loan from the First National Bank in Albuquerque. In connection therewith, on May 9, 1963, Hoppe wrote that bank, inter alia:
 
 
 62
 "Mr. William Kretzer has in hand a copy of a commitment obtained from the Phoenix Title and Trust Company for a temporary loan of $200,000. As you know, we are processing a first mortgage application for a $4,440,000 loan on the above two shopping centers. New York Life Insurance Company has expressed very favorable interest in this loan, and it is presently under consideration in New York. We expect that it will be favorably acted upon by its Committee next week.
 
 
 63
 "As soon as the New York Life Insurance Company commitment is issued, we will be in a position to make the interim construction loan in the amount of $4,440,000. At the time of the first draw under this interim construction loan, any advance which may be then outstanding from your bank, to the partnership will be retired prior to any other disbursements from the construction loan."
 
 
 64
 About May 31, 1963, Dovenmuehle received from New York Life its letter committing it to purchase, inter alia, a $4,440,000 mortgage on Hayden Plaza East and Hayden Plaza West, upon the terms and conditions contained in said letter.
 
 
 65
 Although defendant K-Way had entered into a construction contract on the Woolco store in reliance on Dovenmuehle's repeated promise of financing, which promise plaintiff acknowledged in its May 9, 1963 letter to the Albuquerque bank, upon receipt of said New York Life's commitment, Dovenmuehle failed to perform that promise. Instead, it mailed its own commitment to K-Way dated June 3, 1963, incorporating therein, however, language imposing upon K-Way the same obligations that New York Life set forth in its letter to Dovenmuehle, including an undertaking to pay
 
 
 66
 "as liquidated damages the sum of $44,400. if, without fault on our part, the transaction contemplated hereby shall not be consummated for any reason whatsoever."
 
 
 67
 It is the contention of defendants that they undertook construction in April, 1963, on the promise of financing by Dovenmuehle, that they relied on the documents of March 1, 1963 that their total obligation to Dovenmuehle would be for a 1% service fee and that the loan would be conditioned upon execution of mortgages by K-Way and the assignment of major leases as additional collateral security. Defendants point out that on June 3, 1963 the circumstances were that the Woolco store was under actual construction by them and they had merely a temporary $200,000 construction loan made by the First National Bank of Albuquerque, when they were induced to pay Dovenmuehle $44,400[3] and sign its commitment letter of June 3, 1963. In that letter, among other things, plaintiff promised a $4,440,000 loan and, for the first time, it conditioned its promise of financing to defendants upon their assuming the extensive leasing requirements and additional undertakings required of it by the lender, New York Life. These included plaintiff's travel expenses, the fees and expenses of the lender (New York Life), not to exceed $2500, and the services of plaintiff's outside counsel, not to exceed $7,500.
 
 
 68
 But even so, commencing in July, 1963, defendants experienced work stoppages due to lack of funds. Yet they received none of the promised money from Dovenmuehle. Thus they were compelled to obtain a $4,440,000 interim construction loan from another source (Valley National Bank of Arizona).
 
 
 69
 On August 6, 1963, plaintiff sent a letter to defendants' attorneys with a mortgage note to be executed by defendants in the amount of $4,440,000 and papers, among which was a direction to the Valley National Bank for payment to plaintiff of $22,200 out of the proceeds of its loan to defendants, to pay off the promissory note of defendants held by plaintiff.
 
 
 70
 It was not until many months later (April 29, 1964) that Hoppe, as vice-chairman of Dovenmuehle, issued another commitment letter to K-Way, to make a loan of $4,640,000 conditioned on the same lease requirements as New York Life required of Dovenmuehle in its letter to Dovenmuehle on April 28, 1964. The April 29, 1964 letter to K-Way contained the assertion again that the conditions attached to the New York Life commitment (although addressed to Dovenmuehle) applied to K-Way, including all fees and expenses up to $2500. This letter was "accepted" by Levine who signed it on May 1, 1964 and K-Way then paid $2,000 to Dovenmuehle, making its total payments $46,400.
 
 
 71
 The difficulties experienced by K-Way persisted and became known to plaintiff which on November 20, 1964 wrote K-Way
 
 
 72
 "You have not complied with the terms of the NYLIC commitment nor with the terms of our commitment. By reason of your defaults, New York Life Insurance Company has now terminated its commitment. The $46,400.00 which you deposited with New York Life Insurance Company will be retained by it as liquidated damages."
 
 
 73
 Dovenmuehle in its letter made claim against K-Way for a fee of $46,400 for its services, and also for travel expenses of $935 for Dovenmuehle personnel, $10,000 for services of "our outside counsel" and the latter's disbursements of $454. In closing the letter Dovenmuehle said it would give a release of the mortgage[4] of record and assign the leases, upon payment of said sums, if K-Way paid an additional $100 for the release.
 
 
 74
 K-Way refused to pay these sums and this suit followed.
 
 
 75
 1. Undisputed evidence reveals that under date of March 1, 1963 instruments were made by plaintiff Dovenmuehle and K-Way obligating Dovenmuehle to arrange the financing of permanent loans totaling $4,800,000 and also to arrange a $500,000 "front money" loan. Other than requirements as to repayment of principal and interest, payment of a service fee of 1% of the loans, execution of mortgages when the loans were disbursed, and assignment of major leases as additional collateral, K-Way assumed no other obligations.
 
 But the district court found that:
 
 76
 "* * * neither application was signed by plaintiff and neither bears any indication of acceptance or approval by plaintiff. Neither application was then or thereafter accepted or approved by plaintiff. Both were superseded by subsequent applications and commitments hereinafter described."
 
 
 77
 It then concluded that the documents dated March 1, 1963 were requests for loans and not contracts or commitments for front money or permanent financing.
 
 
 78
 However, the written assent of plaintiff was manifested by Hoppe, vice-chairman of its board of directors, and that of K-Way by Frederick W. Kretzer and Donald Levine. Pertinent here is First National Bank of Elgin v. Husted, 57 Ill.App.2d 227, at 230, 205 N.E.2d 780, 782 (1965), where the court held:
 
 
 79
 "* * * However, `It is not necessary that the signature of a party to a contract should appear at the end thereof; if his name is written by him in any part of the contract, or at the top or right or left hand, with intention to sign or for the purpose of authenticating the instrument, it is sufficient to bind him unless subscription is required by law.' 17 C.J.S. Contracts § 62 b, page 736; McConnell v. Brillhart, 17 Ill. 354, 360 (1856)." and Williston on Contracts (1957, 3d Ed., Vol. 4 § 585) which states:
 
 
 80
 "In fact, it has been held that `No special formality in the execution of the writing is necessary, provided it is signed for the purpose of giving it authenticity as an agreement.' * * *" (pp. 156-157.)
 
 
 81
 "The signature may be in an abbreviated form, as by the use of initials, or the first name only; and it may be by mark, or any code or sign arbitrarily adopted by the writer." (p. 159.)
 
 
 82
 So I would hold that the evidence shows that both plaintiff and defendants intended to be bound by the terms of the March 1, 1963 document. The foregoing finding of the district court is clearly erroneous, 28 U.S.C.A., rule 52(a), and its conclusion is contrary to law and in disregard of the evidence.
 
 
 83
 My position is reinforced, not only by the documentary evidence, but by Donald Levine's positive testimony that the following conversation took place between him and Hoppe about two weeks after the signing and delivery of the March 1, 1963 document. According to Levine, Hoppe said:
 
 
 84
 "The New York Life commitment is in the works. It looks very good, * * * it is completely assured. * * * there are no problems.
 
 
 85
 "At which point, I [Levine] asked him, `Would it be safe for us to go ahead with construction?'
 
 
 86
 "Mr. Hoppe said to me, `I will take care of the financing end; that is my problem. It is safe for you to commence construction. Go ahead and take care of your Woolco commitments.'"[5]
 
 
 87
 This evidence emphasizes the soundness of defendants' present contention that plaintiff acting through Hoppe, chairman of its board of directors, recognized the obligation which it [Dovenmuehle] had assumed on March 1, 1963, to make loans to K-Way totaling $4,800,000 secured by a first mortgage on the premises and major leases to be assigned as additional collateral, for a fee of 1%.
 
 
 88
 I also consider as significant the letter Hoppe wrote to the bank in Albuquerque on May 9, 1963. In that letter, Hoppe stated:
 
 
 89
 "As soon as the New York Life Insurance Company commitment is issued, we will be in a position to make the interim construction loan in the amount of $4,440,000." (Emphasis added.)
 
 
 90
 The scantity of plaintiff's reference to this important evidence in its additional appendix is not surprising but is undoubtedly due to the further recognition (nearly one month before its June 3, 1963 commitment), that plaintiff had promised defendants loans totaling $4,800,000 under date of March 1, 1963.
 
 
 91
 Since Illinois law recognizes the theory that a party is held to have accepted and to be bound by a contract when he performs acts indicating he is accepting and adopting the provisions thereof, even though he had not signed it, the district court's foregoing finding and conclusion that no agreement resulted from the March 1, 1963 documents fails to conform to this theory and should not stand. Calo, Inc. v. AMF Pin Spotters, Inc., 31 Ill.App.2d 2, 176 N.E.2d 1 (1961).
 
 
 92
 2. Actually, whether the instruments dated March 1, 1963 constitute a contract which, as defendants contend, required plaintiff to make loans to them, or whether, as contended by plaintiff, they were merely negotiations which were later superseded by "its integrated writings" of June 3, 1963 and April 29, 1964, it is clear that said instruments of March 1, 1963 embody a request by defendants for loans totaling $4,800,000 for a consideration of 1%, or $48,000. The testimony of Kretzer and Levine, as well as that of Hoppe, proves that thereafter plaintiff repeatedly gave defendants assurances of the financing required by the terms of those instruments, in reliance upon which defendants commenced and continued the construction of their shopping centers, involving action of a definite and substantial character.
 
 
 93
 The equitable theory of promissory estoppel, which has been recognized in Illinois since before Beatty v. Western College, 177 Ill. 280, 292, 52 N.E. 432 (1898), embraces factual situations such as that existing in the case at bar. Some of such situations have been recognized in Rosenberg, Inc., v. Carson, Pirie, Scott Co., 28 Ill.2d 573, 584, 192 N.E.2d 823 (1963), and Bondy v. Samuels, 333 Ill. 535, 545, at 547, 165 N.E. 181, at 186 (1929), where the court said:
 
 
 94
 "* * * Fraud is a necessary element of estoppel, but it is not essential that there be a fraudulent intent. It is sufficient if a fraudulent effect would follow allowing a party to set up a claim inconsistent with his former declarations. Estoppel may arise from silence as well as words. * * *"
 
 
 95
 The recent case of Wheeler v. White, 398 S.W.2d 93 (1965)[6] decided by the Supreme Court of Texas, is by coincidence factually similar to the case at bar. Plaintiff Wheeler, the owner of a tract of land in Port Arthur, Texas, desiring to build a shopping center thereon, entered into a written agreement with defendant White, whereby White was to obtain for Wheeler a $70,000 loan from a third party, or provide it himself, and be paid $5,000 for obtaining the loan, and 5% commission on rentals received from tenants whom he secured for the building. After the contract was signed, White assured Wheeler that the money would be available and urged him to proceed with the necessary task of demolishing the buildings presently on the site, and that, in the event the money was unobtainable elsewhere, he would make the loan himself. Pursuant to such promises Wheeler proceeded to raze the old building and prepare the land for the new structure. Later he was told by White that there would be no loan and Wheeler made reasonable efforts to obtain the loan himself but was unsuccessful.
 
 The court said, at 96:
 
 96
 "Where a promisee acts to his detriment in reasonable reliance upon an otherwise unenforceable promise, courts in other jurisdictions have recognized that the disappointed party may have a substantial and compelling claim for relief. The Restatement, Contracts, § 90, says:
 
 
 97
 `A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'"
 
 
 98
 After citing cases, the court continued, at 96:
 
 
 99
 "These early cases do not speak of the doctrine of promissory estoppel in specific terms since those cases were written before the compilation of the Restatement, but, while many of them dealt with subscription transactions or transactions within the statute of frauds, it is readily apparent that the equities involved in those cases were applicable to the instant case." [Citing authorities.]
 
 
 100
 The Texas Supreme Court said further, at 96:
 
 
 101
 "The binding thread which runs through the cases applying promissory estoppel is the existence of promises designedly made to influence the conduct of the promisee, tacitly encouraging the conduct, which conduct, although not necessarily constituting any actual performance of the contract itself, is something that must be done by the promisee before he could begin to perform, and was a fact known to the promisor. As to the argument that no new cause of action may be created by such a promise regardless of its established applicability as a defense, it has been answered that where one party has by his words or conduct made to the other a promise or assurance which was intended to affect the legal relations between them and to be acted on accordingly, then, once the other party has taken him at his word and acted on it, the party who gave the promise cannot afterward be allowed to revert to the previous relationship as if no such promise had been made. This does not create a contract where none existed before, but only prevents a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them. See 1 Williston, Contracts, §§ 139-40 (Rev. ed. 1936); and 48 A.L.R.2d 1069 (1956)."
 
 
 102
 At 96, the court limited the function of the doctrine of promissory estoppel, however, to a defense, in that "it estops a promisor from denying the enforceability of the promise" and cited Dickerson v. Colgrove, 100 U.S. 578 at 580, 25 L.Ed. 618 (1879), where the court said:
 
 
 103
 "The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden * * *. This remedy is always so applied as to promote the ends of justice."
 
 
 104
 The United States Supreme Court, however, in Dickerson, added:
 
 
 105
 "It is available only for protection, and cannot be used as a weapon of assault * * * It is akin to the principle involved in the limitation of actions, and does its work of justice and repose where the statute cannot be invoked."[7]
 
 
 106
 Dickerson was referred to as "a very carefully considered opinion" in Wehrman v. Conklin, 155 U.S. 314, 327, 15 S.Ct. 129, 39 L.Ed. 167 (1894), and it was followed in Glus v. Brooklyn Eastern Dist. Terminal, 359 U.S. 231, 234, notes 6 and 10, 79 S.Ct. 760, 3 L.Ed.2d 770 (1958).
 
 
 107
 In the case at bar, plaintiff promised defendants it would make loans to defendants for a consideration of 1% of the loans requested. Thereafter, on the assurances of plaintiff that it was safe to commence and continue construction and that plaintiff would take care of the financing even if it had to use its own funds or the funds of its customers, defendants commenced and continued the construction of their shopping centers, thereby substantially altering their position by assuming liability for various construction contracts. In view of these undertakings, defendants found themselves in need of funds and induced to accede to additional demands of plaintiff for payment of fees and expenses totaling $57,789.69.
 
 
 108
 This court should not countenance the perpetration of such a manifest injustice as appears in the record before us. An examination of that record reveals that, even if the court should find in the document of April 29, 1964 sued upon, any factual or legal basis supporting plaintiff's demands on defendants for additional compensation, it would be required, in order to avoid a fraudulent effect, to hold that plaintiff is estopped to assert such facts and theories. Plaintiff's failure to meet its promise to make loans at a cost not to exceed $48,000,[8] in reliance upon which promise defendants commenced construction of their shopping centers, entitles defendants to the benefit of the defense of promissory estoppel. (See Wheeler v. White, supra. Cf. 1 Williston on Contracts, 3rd Ed. § 140, p. 614.)
 
 
 109
 Justice requires that the judgment of the district court on the complaint herein be reversed.
 
 
 110
 3. I now discuss the district court's dismissal of the counterclaim herein.
 
 
 111
 In Odekirk v. Sears Roebuck & Co., 274 F.2d 441, cert. denied 362 U.S. 974, at 445, 80 S.Ct. 1060, 4 L.Ed.2d 1011 (1960), we said:
 
 
 112
 "* * * Although a state-created right may be enforced in a federal court because of diversity of citizenship, the federal court will proceed by its own rules of procedure, acquired from the federal government, and, therefore, not necessarily identical with those of the courts in the state in which the federal court is sitting. Byrd v. Blue Ridge Rural Elec. Co-op., 1958, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953, rehearing denied 357 U.S. 933, 78 S.Ct. 1366, 2 L.Ed.2d 1375."
 
 
 113
 Accordingly I would apply the declaration in Dickerson, supra, and hold that defendants are not entitled under the doctrine of promissory estoppel to obtain affirmative relief from plaintiff. Hence the district court's dismissal of the counterclaim herein should be affirmed by this court.
 
 
 
 Notes:
 
 
 [1]
 Woolworth's leasing corporation
 
 
 [2]
 One application (defendants' exhibit 1), requested a loan of $2,100,000 by Dovenmuehle to K-Way on the Hayden Plaza West project, and the other (defendants' exhibit 2), a $2,700,000 loan on the Hayden Plaza East project
 
 
 [3]
 $22,000 was paid in cash and a $22,200 demand promissory note was given
 
 
 [4]
 It should be noted that no money was advanced to K-Way by Dovenmuehle on this mortgage, which had been recorded
 
 
 [5]
 When Hoppe was a witness for plaintiff, he was asked on cross-examination about Levine's testimony as to this conversation. The appendices show Hoppe then became evasive in his responses so repeatedly that I conclude his attitude as a witness actually tends to corroborate the testimony of Donald Levine above-referred to
 
 
 [6]
 While Illinois law governs in the case at bar, this Texas decision is relevant, as both states have adopted the common law of England. Ill.Rev.Stat. Ch. 28 § 1 (1965); Vernon's Texas Ann.Stat. Art. 1 (1959)
 
 
 [7]
 The tendency to enlarge the scope of this doctrine is evidenced by Hoffman v. Red Owl Stores, Inc., 26 Wis.2d 683, 133 N.W.2d 267 (1965), where the doctrine of promissory estoppel was extended to sustain a recovery of damages by the plaintiffs. The Supreme Court of Wisconsin there concluded, at 275:
 "* * * injustice would result here if plaintiffs were not granted some relief because of the failure of defendants to keep their promises which induced plaintiffs to act to their detriment."
 
 
 [8]
 1% of the loans requested by the March 1, 1963 instruments